**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

N.B. and C.B., individually and as
the parents of C.B., a minor,
             *Plaintiffs-Appellants,*

      v.

HELLGATE ELEMENTARY SCHOOL
DISTRICT, by and through its
BOARD OF DIRECTORS, MISSOULA
COUNTY, MONTANA,
             *Defendant-Appellee.*

No. 07-35018

D.C. No.
CV-05-00089-DWM

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, Chief District Judge, Presiding

Argued and Submitted
May 9, 2008—Seattle, Washington

Filed September 4, 2008

Before: Arthur L. Alarcón, Susan P. Graber, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Alarcón

12155

**COUNSEL**

Andrée Larose, Montana Advocacy Program, Helena, Montana, for the plaintiffs-appellants.

Elizabeth A. Kaleva, Missoula, Montana, for the defendant-appellee.

Brett M. Schuman, Morgan, Lewis, & Bockius LLP, San Francisco, California, for amici curiae.

**OPINION**

ALARCÓN, Circuit Judge:

**I**

Appellants, minor C.B. and his parents (collectively "Appellants"), allege that Hellgate Elementary School District ("Hellgate") violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, by failing to provide minor C.B. with a free appropriate public education ("FAPE"). Appellants appeal from the district court's order, affirming the hearing officer's findings of fact, conclusions of law, and order that found Hellgate did not violate the IDEA. On appeal, Appellants argue that C.B.'s procedural and substantive rights under the IDEA were violated. Appellants assert that Hellgate failed to meet its procedural obligation under the IDEA to evaluate C.B. to determine whether he was autistic. Appellants also contend that C.B. was denied his sub-

stantive rights under the IDEA when Hellgate denied him extended school year ("ESY") services. We vacate and remand the district court's order that Hellgate was not liable for violating C.B.'s procedural rights under the IDEA. We conclude that Hellgate did not fulfill its procedural requirements under the IDEA to evaluate C.B. We affirm the district court's decision that Hellgate did not violate C.B.'s substantive rights in denying ESY services.

## II

C.B. lives with his parents within the Hellgate School District in Missoula, Montana. Hellgate is a local educational agency. It receives federal funding to fulfill its responsibility to provide its students a FAPE.

### A

Prior to moving to Missoula, Montana, in August 2003, C.B. and his parents resided in Sparta Township, New Jersey. On January 3, 2003, when C.B. was two years and ten months old, he was examined by Dr. Arnold Gold. Dr. Gold concluded that an "autistic component appears to be complicating [C.B.]'s performance" and that speech therapy was mandatory.

The Sparta School District ("Sparta") designed an Individualized Education Program ("IEP") for C.B. on June 4, 2003, to be implemented from the period of July 1 to September 3, 2003, and the following school year. The IEP provided for twelve and a half-hours of special instruction, including speech/language therapy two times per week for thirty minutes, plus individual speech/language therapy two times per week for thirty minutes.

### B

After Appellants moved to Missoula, Montana, in the summer of 2003, C.B. enrolled in Hellgate Elementary School. In

August 2003, C.B.'s parents hand-delivered a copy of C.B.'s medical and educational records to Hellgate's special education director, Sally Woodruff. At this meeting, C.B.'s parents discussed Dr. Gold's evaluation with Ms. Woodruff.

Hellgate adopted the IEP designed by Sparta in August 2003. When Hellgate personnel observed that the plan was not benefitting C.B., it reduced speech therapy for a two and a half-week period from August to September 2003. Jamie Frost, the Hellgate speech pathologist, disagreed with the need for two hours of weekly speech/language therapy provided for in the Sparta IEP. She stated that it caused C.B. to "shut down" and "refuse to talk" in the classroom.

C.B.'s parents also enrolled him in Co-Teach, a private preschool program, in August 2003. C.B.'s parents informed Co-Teach that they were enrolling him at Co-Teach because they were "concerned about autism."

On September 22, 2003, Hellgate convened a meeting to develop a new IEP for C.B. C.B.'s parents were present. At the meeting, Hellgate personnel stated that they lacked sufficient information about C.B.'s educational needs to develop specific IEP goals and objectives for him. Before this meeting, the Hellgate members of the IEP team had read Dr. Gold's evaluation, but did not discuss it at the meeting. The IEP team determined that C.B. should be evaluated by conducting classroom observations for approximately six weeks to assess his speech, language, behavioral, social, and preschool readiness skills. The IEP team's plan was set forth in a document entitled a "diagnostic IEP." The diagnostic IEP reduced educational and related services from thirteen and a half hours to approximately five hours per week. It also reduced speech therapy from two hours per week to one-half hour per week. C.B.'s mother signed the diagnostic IEP.

On November 18, 2003, Hellgate conducted a meeting to create an IEP to replace the diagnostic IEP. During this meet-

ing, C.B.'s parents suggested to Hellgate IEP team members that C.B. might be autistic. The Hellgate IEP team referred the parents to Missoula Child Development Center ("CDC"), where free autism testing could be performed with parental consent. On March 3, 2004, the CDC reported that C.B. exhibited behavior consistent with autism spectrum disorder, including significant ongoing speech and language deficits, motor skill deficits, mild cognitive deficits, and atypical behaviors. In response to the CDC's diagnosis, the IEP team reconvened on March 22, 2004. It revised the IEP, incrementally increasing preschool instruction time from approximately five hours per week to twelve and a half hours per week by May 24, 2004.

## C

The IEP team reconvened on May 7, 2004, to develop C.B.'s IEP for the 2004-05 school year and determine C.B.'s need for ESY services. C.B.'s parents were present. The Hellgate IEP team members determined that C.B. did not require ESY services. C.B.'s parents refused to endorse the proposed IEP. They expressed their disagreement with the Hellgate team members' decision not to provide ESY services. The parents did not sign the plan and did not enroll C.B. in Hellgate in September 2004.

## III

### A

Appellants filed a request for an impartial due process hearing with the Montana Office of Public Instruction ("OPI") on or about September 28, 2004. An administrative due process hearing was conducted over the course of seven days in January and February 2005. The due process hearing officer issued his findings of fact, conclusions of law, and order on April 25, 2005, denying Appellants' claim for relief.

**B**

Appellants filed a Complaint with the United States District Court for the District of Montana on May 24, 2005. The district court affirmed the hearing officer's order. On January 3, 2007, Appellants filed a timely appeal with this court. This court has jurisdiction under 28 U.S.C. § 1291, as this is an appeal from a final judgment of a United States District Court entered December 4, 2006. This is a civil action arising under the laws of the United States, namely the IDEA. The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(3) (1997).

**IV**

**A**

We review the district court's findings of fact for clear error even when they are based on the written record of administrative proceedings. *Burlington N., Inc. v. Weyerhaeuser Co.*, 719 F.2d 304, 307 (9th Cir. 1983); *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir. 1987). A finding of fact is clearly erroneous when the evidence in the record supports the finding but "the reviewing court is left with a definite and firm conviction that a mistake has been committed." *Burlington N., Inc.*, 719 F.2d at 307. Questions of law and mixed questions of fact and law are reviewed de novo, unless the mixed question is primarily factual. *Gregory K.*, 811 F.2d at 1310. We review de novo the question whether a school district's proposed individualized education program provided a FAPE. *Id.*

**B**

**[1]** "The IDEA provides federal funds to assist state and local agencies in educating children with disabilities, but conditions such funding on compliance with certain goals and procedures." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467,

1469 (9th Cir. 1993). Its goal is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A) (1997). The term "free appropriate public education" is defined as "special education and related services that . . . are provided in conformity with the individualized education program required under section 1414(d) of this title." *Id.* § 1401(8)(D). The term "individualized education program" is defined in the IDEA as "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of this title." *Id.* § 1401(11).

**[2]** "[A] state must comply both procedurally and substantively with the IDEA." *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 644 (9th Cir. 2005) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982)). In determining whether Hellgate denied Plaintiff a FAPE, the court must engage in a two-step inquiry. First, the court must examine "whether 'the State complied with the procedures set forth in the Act' and, second, whether 'the individualized educational program developed through the Act's procedures [was] reasonably calculated to enable the child to receive educational benefits.' " *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 890 (9th Cir. 2001) (alteration in original) (quoting *Rowley*, 458 U.S. at 206-07). However, the court need not reach the question of substantive compliance if the court finds " 'procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits.' " *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1129 (9th Cir. 2003) (quoting *Amanda J.*, 267 F.3d at 892). Here, Appellants contend that Hellgate failed to comply with both the procedural and substantive requirements of the IDEA. Each argument will be addressed in turn.

## C

**[3]** Compliance with the IDEA procedures is "essential to ensuring that every eligible child receives a FAPE, and those procedures which provide for meaningful parent participation are particularly important." *Amanda J.*, 267 F.3d at 891. "When the elaborate and highly specific procedural safeguards embodied in [the IDEA] are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid." *Rowley*, 458 U.S. at 205. Furthermore, a school district must comply not only with federal statutory and regulatory procedures, but with state regulations as well: "State standards that are not inconsistent with federal standards [under the IDEA] are also enforceable in federal court." *W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1483 (9th Cir. 1992).

Yet, as the Ninth Circuit has recognized, there is some leeway in the procedural requirements:

> Not every procedural violation, however, is sufficient to support a finding that the child in question was denied a FAPE. Technical deviations, for example, will not render an IEP invalid. On the other hand, procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits, clearly result in the denial of a FAPE.

*Amanda J.*, 267 F.3d at 892 (citations and internal quotations omitted).

Appellants contend that C.B.'s IEPs were not developed in compliance with the IDEA procedural requirements because: (1) the diagnostic IEP was not valid; and (2) Hellgate failed

to meet its obligation to evaluate C.B. in all areas of suspected disability. As explained below, we are persuaded that the district court erred in determining that Hellgate complied with the procedural requirements of the IDEA. We conclude that Hellgate's failure to meet its obligation to evaluate C.B. in all areas of suspected disability, including whether he is autistic, was a procedural error that denied C.B. a FAPE. Thus, this court need not reach the question whether the diagnostic IEP was valid.

## D

Appellants assert that Hellgate failed to meet its obligation under the IDEA to evaluate C.B. when it referred C.B.'s parents to the CDC, for an autism evaluation, rather than arranging for an evaluation after being apprised of Dr. Gold's diagnosis. Appellants do not object to the fact that the CDC conducted the evaluation; it is undisputed that Hellgate did not have personnel qualified to conduct an autism evaluation. Rather, Appellants maintain that Hellgate's failure to *obtain* the evaluation and to give C.B.'s parents notice that it would pay the cost of an evaluation, if any, violated the IDEA, 20 U.S.C. § 1414(a)-(c) (1997). Appellants contend that the hearing officer and the district court erroneously concluded that C.B.'s parents had the burden of obtaining the evaluation from the CDC. They also argue that Hellgate's failure to obtain a timely autism evaluation was fatal to the development and delivery of a FAPE during the 2003-04 school year.

[4] A child must be tested in all areas of suspected disability. 20 U.S.C. § 1414(b). The evaluation includes gathering information "that may assist in determining . . . the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general curriculum, or, for preschool children, to participate in appropriate activities." 20 U.S.C. § 1414(b)(2)(A) (1998). The "local educational agency shall administer such tests and other evaluation materials as may be

needed to produce the data identified by the IEP Team" in order to determine the needs of the child. *Id.* § 1414(c)(2). "Each local educational agency shall ensure that—(B) any standardized tests that are given to the child— . . . (ii) are administered by trained and knowledgeable personnel." *Id.* § 1414(b)(3)(B)(ii) (1998). In conducting or obtaining an evaluation, the school district "shall ensure that the child is assessed in all areas of suspected disability." *Id.* § 1414(b)(3)(C) (1997); 34 C.F.R. § 300.532(g) (1999).

As of September 2003, Hellgate's IEP team members were on notice that C.B. likely suffered from some form of autism. The record indicates that C.B.'s parents discussed Dr. Gold's evaluation with Hellgate's special education director in August 2003. Further, it is undisputed that by the time of the September 2003 IEP meeting, Hellgate personnel had reviewed Dr. Gold's evaluation. This evaluation was enclosed in C.B.'s file indicating that there was an "autistic component" to C.B.'s poor performance.

**[5]** Hellgate suggested to C.B.'s parents that they obtain a general evaluation of C.B. at the September 22, 2003, IEP meeting. It referred C.B.'s parents to the CDC for general testing. Hellgate contends that, despite this recommendation, C.B.'s parents failed to procure an evaluation from the CDC after the September 2003 IEP meeting. The fact that Hellgate referred the parents to the CDC shows that Hellgate was mindful that an evaluation was necessary. Thus, Hellgate's assertion that it did not suspect C.B. had autism prior to the November 2003 IEP meeting, because C.B.'s parents had not raised it at a prior IEP meeting, is not supported by the record. Hellgate failed to meet its obligation to evaluate C.B. in all areas of suspected disabilities after becoming aware of Dr. Gold's diagnosis.

**[6]** Hellgate did not fulfill its statutory obligations by simply referring C.B.'s parents to the CDC. Such an action does not "ensure that the child is assessed," as required by 20

U.S.C. § 1414(b)(3)(C). *See also Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1523 (9th Cir. 1994) (holding that a parent's failure to secure an evaluation, even if the parents agreed to obtain it, does not excuse the school district's obligation under the IDEA to secure such an evaluation). In *Union School District*, the parents of the student failed to turn over portions of a report issued by a specialist that may have been relevant to the placement of the student. *Id.* The court held that the "failure of the [parents] to turn over portions of a specialist's report cannot excuse the District's failure to procure the same information for itself." *Id.*

[7] A school district cannot abdicate its affirmative duties under the IDEA. *W.G.*, 960 F.2d at 1484-85. In *W.G.*, the school failed to ensure that the proper parties were involved in the IEP meetings, as required by statute. *Id.*

> Target Range's arguments that the parents are to blame because they left the IEP meeting, did not file a dissenting report, and led the district to believe that the principal problem was transportation, are without merit. The parents had no obligation to file a dissent. . . .
>
> The Act imposes upon the school district the duty to conduct a meaningful meeting with the appropriate parties. Target Range failed to do so. Target Range failed to fulfill the goal of parental participation in the IEP process and failed to develop a complete and sufficiently individualized educational program according to the procedures specified by the Act.

*Id.* at 1485.

[8] The failure to obtain critical medical information about whether a child has autism "render[s] the accomplishment of the IDEA's goals—and the achievement of a FAPE—

impossible." *Amanda J.*, 267 F.3d at 894. In *Amanda J.,* the school district withheld from Amanda's parents reports indicating possible autism. This court stated:

> We hold that, by failing to disclose Amanda's full records to her parents once they were requested, in violation of 20 U.S.C. § 1415(b)(1)(A), the District denied Amanda a FAPE. The IEP team could not create an IEP that addressed Amanda's special needs as an autistic child without knowing that Amanda was autistic. Even worse, Amanda's parents were not informed of the possibility that their daughter suffered from autism—a disease that benefits from early intensive intervention—despite the fact that the district's records contained test results indicating as much. Not only were Amanda's parents prevented from participating fully, effectively, and in an informed manner in the development of Amanda's IEP, they were not even aware that an independent psychiatric evaluation was recommended, an evaluation that Amanda's mother testified she would have had performed immediately. These procedural violations, which prevented Amanda's parents from learning critical medical information about their child, rendered the accomplishment of the IDEA's goals—and the achievement of a FAPE—impossible.

*Id.* Similar to the circumstances in *Amanda J.,* without evaluative information that C.B. has autism spectrum disorder, it was not possible for the IEP team to develop a plan reasonably calculated to provide C.B. with a meaningful educational benefit throughout the 2003-04 school year. Because of this procedural error, Appellants are entitled to the costs of the services that they incurred during the 2003-04 school year and associated legal fees.

## V

Appellants also assert that Hellgate denied C.B. his substantive right to a FAPE under the IDEA in refusing to provide C.B. with ESY services. Appellants contend that the district court applied an incorrect standard in defining C.B.'s substantive rights under the IDEA. They assert that the district court erred in employing a "regression/recoupment" standard in determining that C.B. was not entitled to ESY services, as opposed to a multi-faceted inquiry, as purportedly required by state law. Appellants also argue that a multi-faceted inquiry would have disclosed that C.B. was entitled to receive services during the summer of 2004. We disagree.

## A

[9] The district court did not err in applying a regression/recoupment standard. Under the IDEA, "[e]ach public agency shall ensure that extended school year services are available as necessary to provide FAPE." 34 C.F.R. § 300.309(a)(1) (1999). The federal regulation does not specify the factors to be considered in determining entitlement to ESY services. The Montana OPI identifies a variety of factors that may be used to determine whether the regression/recoupment of skills requires ESY services.[1]

---

[1]The Montana OPI factors include:

- the nature and severity of the student's disability;

- the ability of the student's parents to provide educational structure in the home;

- behavioral and physical impairments;

- the ability of the student to interact with peers;

- the student's vocational needs;

- the availability of alternative resources; and

- whether there are "emerging skills" and "breakthrough opportunities," as when a student is on the brink of learning to read.

*Extended School Year Services* at 3 (Montana Office of Public Instruction 2002).

The hearing officer found that Hellgate did not violate the IDEA in refusing C.B.'s parents' request that ESY be provided for the summer of 2004. In reaching this conclusion, the hearing officer applied the regression/recoupment formula, articulating the seven factors identified by the Montana OPI. The hearing officer concluded that Hellgate complied with the Montana OPI guideline for ESY entitlement. The hearing officer reasoned as follows:

> 108.   ESY criteria relevant to the student were considered by the team. The team considered the nature and severity of his disability. The team considered the ability of his parents to provide educational structure at home. The team considered behavioral and physical impairments.

> 109.   After extensive discussion, it was concluded that the student was not on the verge of breakthrough opportunity of emerging skills because his progress was steady and was not eligible for ESY services.

**[10]** In affirming the hearing officer's discussion, the district court relied on the regression/recoupment formula in its discussion. Appellants contend that because the district court did not articulate each of the Montana OPI factors, the district court erred. Hellgate correctly notes that the language of the Montana OPI instruction clarifies that the factors are used in determining "whether regression/recoupment of skills requires ESY services." *Extended School Year Services* at 3. The factors are therefore a part of the regression/recoupment test. While the district court enunciated the regression/recoupment test in a shorthand fashion, the district court made the determination that C.B. was not entitled to ESY services by appropriately using the Montana OPI factors.

**B**

Appellants also maintain that the hearing officer and district court erred in determining that C.B. was not entitled to

ESY services. This circuit has not yet developed a standard for determining when ESY services are appropriate under the IDEA.

[11] Under the IDEA, schools are required to provide ESY services as necessary in order to provide a child with a FAPE. 34 C.F.R. § 300.309(a). A school must provide these services, however, only if the child's IEP team determines that such services are necessary "for the provision of FAPE to the child." *Id.* "[A] claimant seeking an ESY must satisfy an even stricter test, because 'providing an ESY is the exception and not the rule under the regulatory scheme.' " *Bd. of Educ. of Fayette County v. L.M.*, 478 F.3d 307, 315 (6th Cir.) (quoting *Cordrey v. Euckert,* 917 F.2d 1460, 1473 (6th Cir. 1990)), *cert. denied*, 128 S. Ct. 693 (2007). "ESY Services are only necessary to a FAPE when the benefits a disabled child gains during a regular school year will be significantly jeopardized if he is not provided with an educational program during the summer months." *MM ex rel. DM v. Sch. Dist. of Greenville County,* 303 F.3d 523, 537-38 (4th Cir. 2002).

> If the child benefits meaningfully within his potential from instruction under a proper IEP over a regular school year, then ESY service may not be required under the Act unless the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an [ESY].

*Cordrey*, 917 F.2d at 1473 (internal quotation marks omitted) (alteration in original). A claimant must show, in other words, that "an ESY is necessary to permit [the child] to benefit from his instruction." *Id.* (internal quotation marks omitted) (alterations in original). Claimants can rely on expert opinion testimony to make this showing and are not required to present empirical proof of actual prior regression. *Id.* at 1471-72.

On the question whether C.B. was entitled to ESY services, the hearing officer heard conflicting expert testimony. Appel-

lants' expert witness, Dr. Ilene Schwartz, testified that children with autism needed to receive year-round services. She also testified that summer programming was important for consistency and continuity. Another of Appellants' witnesses, Dr. Kelker, did not agree that every child with a form of autism needs ESY services. Dr. Kelker did opine that failure to provide ESY denied C.B. a FAPE because the student's language skills were just beginning to emerge. But Dr. Kelker had never met or observed C.B. and had no direct knowledge of C.B.'s language skills.

Members of the IEP team testified on behalf of Hellgate that C.B. was making steady progress. For example, Ms. Frost testified that C.B. did not show regression during school breaks. The hearing officer found that "[t]he data collected done [sic] by the District staff regarding regression indicated he did not show regression which could not be recouped, and in some cases showed no regression at all."

The hearing officer also concluded that the testimony by Hellgate personnel, who had a daily relationship with C.B., was more persuasive than that of Appellants' witnesses, whose opinions were predominantly based on impersonal file reviews. The IDEA provides, in pertinent part, that "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B) (1999). As a result, the court may give less than the usual deference to the administrative hearing officer's findings of fact. *Vashon,* 337 F.3d at 1126. Due weight must be accorded to the administrative findings, and the court determines how much weight to give to these findings and to any additional evidence it deems appropriate to admit. *Id.* at 1127. We define "due weight" as follows: "The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material

issue. After such consideration, the court is free to accept or reject the findings in part or in whole." *Id.* at 1127 n.16.

**[12]** We conclude that it was reasonable for the hearing officer to rely on the testimony of Hellgate's witnesses because they had observed C.B.'s school performance. In contrast, Appellants' witnesses based their opinions predominantly upon file reviews. Thus, the district court and the hearing officer did not err in determining that the denial of ESY services was appropriate.

## C

**[13]** Appellants also contend that the district court applied an incorrect standard in determining whether C.B. was provided a FAPE. Under the 1997 amendments to the IDEA, a school must provide a student with a "meaningful benefit" in order to satisfy the substantive requirements of the IDEA. *See Adams v. Oregon*, 195 F.3d 1141, 1145 (9th Cir. 1999) (applying the "meaningful benefit" test); *see also Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 862 (6th Cir. 2004) ("[W]e agree that the IDEA requires an IEP to confer a 'meaningful educational benefit' gauged in relation to the potential of the child at issue.").

**[14]** Here, the district court appears to have applied both the pre-amendment *Rowley* "some educational benefit" standard[2] and the heightened "meaningful benefit" standard.[3] In one part of the order, the district court explained:

---

[2]The *Rowley* Court held that, while an IEP need not maximize the potential of a disabled student, it must provide "meaningful" access to education, and confer "some educational benefit" upon the child for whom it is designed. *Rowley*, 458 U.S. at 200. As a result, if a school provided a child with "some educational benefit," it satisfied the requirements of the IDEA, as established under *Rowley*. *Id.*

[3]In 1997, Congress amended the IDEA, obligating schools to provide children with disabilities with more than "some educational benefit," as

> The Individualized Education Program is reasonably calculated to enable the child to receive educational benefit if it provides only *some* educational benefit. [*Rowley*, 458 U.S. at 200]. These rules provide for a very low standard, setting a "floor of opportunity. . ." This Court need only find that C.B. advanced slightly to find that the program was reasonably calculated to enable him to receive a benefit. *Id.*

In a different part of the order, the district court articulated the "meaningful benefit" standard, stating: "The school's approach may be 'reasonably calculated to confer meaningful educational benefits,' even though it may be different from the parents' approach." The district court also stated: "Hellgate personnel all agreed that the September 22 interim [IEP], using Sparta goals and objectives as a guide, provided meaningful benefit." Though the district court articulated two different FAPE standards, any error made in describing the test is harmless because it did not err in its determination that ESY services were not required.

## CONCLUSION

We vacate and remand that portion of the district court's order that Hellgate fulfilled its procedural requirements under the IDEA in developing the IEPs for the 2003-04 school year. Upon remand, the district court is instructed to calculate the costs incurred by C.B.'s parents for the 2003-04 school year in providing alternative educational services, and their legal

---

prescribed by *Rowley*. This represented a significant shift in the focus from the disability education system prior to 1997. The primary purpose of the EHA [the predecessor to the IDEA] was to provide "access" to education for disabled students. *Id.* at 179, 192 (noting that "the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside").

fees. We affirm the district court's order that Hellgate properly denied C.B. ESY services.

**VACATED IN PART** and **REMANDED IN PART with instructions**; **AFFIRMED IN PART**.

Costs on appeal are awarded to Appellants.