**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAYNA CROFTS,
        *Plaintiff-Appellant*,

    and

JEREMY SANDERS,
        *Plaintiff*,

    v.

ISSAQUAH SCHOOL DISTRICT
NO. 411,
        *Defendant-Appellee*,

    and

MELISSA MADSEN; RON THIELE,
        *Defendants*.

No. 19-35473

D.C. No.
2:17-cv-01365-
JLR

OPINION

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted November 19, 2021
Pasadena, California

Filed January 12, 2022

Before: Marsha S. Berzon and Johnnie B. Rawlinson, Circuit Judges, and Jennifer A. Dorsey,[*] District Judge.

Opinion by Judge Dorsey

## SUMMARY[**]

### Individuals with Disabilities Education Act

Affirming the district court's summary judgment in favor of a school district in an action under the Individuals with Disabilities Education Act, the panel held that the school district properly denied a student's parent's request for an independent educational evaluation, properly evaluated the student for an individualized education plan, and did not deny the student a free appropriate public education.

Affording deference to a state administrative law judge, the panel held that the ALJ properly discounted expert witness testimony.

The panel held that the school district satisfied the IDEA by evaluating the student for a "specific learning disability," and the school district did not violate its obligation to evaluate the student in "all areas of suspected disability" when it did not formally evaluate her for dyslexia. The panel

---

[*] The Honorable Jennifer A. Dorsey, United States District Judge for the District of Nevada, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

further held that the school district's IEPs were reasonably calculated to help the student progress, and the school district did not deny her a FAPE by failing to use her parents' preferred teaching method.

---

**COUNSEL**

Theresa M. DeMonte (argued), McNaul Ebel Nawrot & Helgren PLLC, Seattle, Washington, for Plaintiff-Appellant.

Sarah C. Johnson (argued) and Carlos A. Chavez, Pacific Law Group LLP, Seattle, Washington, for Defendant-Appellee.

Angela M. Shapow, Cedar Law PLLC, Seattle, Washington, for Amicus Curiae Washington State Branch of the International Dyslexia Association.

---

**OPINION**

DORSEY, District Judge:

Plaintiff-appellant Layna Crofts, on behalf of her minor daughter A.S., sued defendants-appellees Issaquah School District and two school-district administrators for multiple violations of the Individuals with Disabilities Education Act (IDEA) following A.S.'s second- and third-grade school years. Crofts requested that the District evaluate A.S. for special-education services after she received an outside evaluation indicating that A.S. might have dyslexia. The District evaluated A.S. under the IDEA's enumerated "specific learning disability" category, which statutorily encompasses conditions like dyslexia. It determined that she

was eligible for services in reading and writing, so it created an individualized education plan (IEP) targeting A.S.'s deficiencies in those areas.  Crofts contends that the District should have evaluated A.S. specifically for dyslexia and used her preferred teaching method for dyslexia, and that it improperly denied her request for an independent educational evaluation (IEE).  The District's actions, she claims, procedurally violated the IDEA and denied A.S. a free appropriate public education (FAPE).

A Washington State Administrative Law Judge (ALJ) found that the District did not violate the IDEA by evaluating A.S. under the specific-learning-disability category and not specifically for dyslexia.  The United States District Court for the Western District of Washington affirmed, finding that the District properly denied Crofts's request for an IEE, properly evaluated A.S. for an IEP, and did not deny A.S. a FAPE.

We conclude that the District correctly evaluated A.S. for a specific learning disability—of which dyslexia is one—and provided an education reasonably calculated to enable A.S. to make appropriate progress in light of her disability.  The District was also not required to use the parents' preferred teaching method to provide A.S. with a FAPE.  We therefore affirm the district court's order in its entirety.[1]

---

[1] Crofts requests that this court take judicial notice of the Department of Education's April 25, 2016, Letter to Kelli Unnerstall, a non-binding letter addressing the use of the term "dyslexia" in IDEA evaluations.  The District does not oppose.  We grant Crofts's request because the ALJ referenced the letter, and it is from a source "whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); *see also Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 851 n.10 (9th Cir.

## I. Factual Background

Throughout the relevant time period, A.S. attended an elementary school in the Issaquah School District.  In the summer before A.S.'s second-grade school year, her parents requested an IDEA evaluation because they believed she might have dyslexia.  Before school started, the parents had A.S. evaluated by a retired school psychologist.  The evaluator conducted numerous assessments of A.S.'s reading skills and cognitive ability and determined that she "demonstrated a pattern of academic and cognitive strengths and weaknesses consistent with th[e] classic profile of the specific learning disability of dyslexia."

At the beginning of A.S.'s second-grade year, the District agreed to proceed with its own initial evaluation, and over the next month, it conducted a series of assessments designed to gauge A.S.'s eligibility for special-education services.  The resulting evaluation report cited the outside evaluator's assessments and suggestion that A.S. has dyslexia, as well as the District's own assessments and observations. It concluded that A.S. was eligible for services under the IDEA's "specific learning disability" category, which statutorily includes conditions like dyslexia.  *See* 20 U.S.C. § 1401(30).

A.S.'s second-grade IEP provided her with 40 minutes of reading and writing instruction per day in a special-education classroom, as well as several accommodations for her general-education instruction.  Her general- and special-education teachers used a variety of reading programs when instructing A.S., including programs with multi-sensory

2016) (noting that "courts routinely take judicial notice of letters published by the government").

approaches designed for students who have difficulty reading. In February of that school year, her parents called for another IEP meeting, citing their concern that A.S. wasn't making sufficient progress toward her IEP goals. They requested numerous additional accommodations, including that A.S.'s teachers be trained in and use the "Orton-Gillingham Approach," an instructional method for reading that the parents believed would be best for a student with dyslexia. The District denied the request, stating that it "ha[d] already chosen research and evidence-based curriculums and methodologies which are utilized for both general education and special education settings." A.S.'s second-grade report card reflected progress in her general- and special-education classes, particularly in reading. But while she progressed toward her IEP goals, she fell short of meeting them.

At the beginning of A.S.'s third-grade year, the District held another IEP meeting with the help of an outside facilitator. A.S.'s IEP team then reassessed her academic performance and prepared new IEP goals. The team increased A.S.'s special-education instructional time from 40 to 60 minutes per day and revised her general-education accommodations. The parents again requested that the District teach A.S. using the Orton-Gillingham Approach and that A.S.'s disability category be changed from "specific learning disability" to "dyslexia." The District denied both requests, stating that, under the applicable law, "specific learning disability" serves as the eligibility category for dyslexia and that the District does not identify specific learning programs in IEPs. A.S. continued to progress in reading, and by December of her third-grade year, she'd moved up another three levels.

## II. Procedural Background

After A.S.'s third-grade IEP meeting, her parents requested an IEE at the District's expense.  The District did not agree that an IEE was warranted and filed a request for an administrative hearing to show that its internal evaluations were appropriate.  A.S.'s parents filed their own hearing request soon after, alleging that the District denied A.S. a FAPE during her second- and third-grade years.

During the 10-day ALJ hearing, Crofts called nine witnesses to testify, including Cheryl Anthony, whom she refers to as a dyslexia expert.  Anthony is a certified teacher, was the past president of the Oregon chapter of the International Dyslexia Association, and runs a business that provides screening for dyslexia and dysgraphia.  Anthony reviewed A.S.'s IEP and test scores and some of her completed work, but she did not meet with or evaluate A.S. or speak to any of her teachers.

Anthony recommended the Orton-Gillingham Approach for teaching children with dyslexia, explaining that this method best addresses the phonological deficits that children with dyslexia face.  Anthony also testified that the educational services the District provided were not appropriate for a child with dyslexia.  According to Anthony, the goals in A.S.'s IEPs were not calculated to help a child with dyslexia progress to the level she could potentially achieve.  She opined that A.S. wasn't given a FAPE in her second- or third-grade years because her IEP wasn't created to address dyslexia.

District officials testified that they do not evaluate for or diagnose dyslexia but instead evaluate students for a specific learning disability, which they understood to be the umbrella term that encompasses dyslexia.  A.S.'s teachers also

testified that, while the District did not give them dyslexia-specific training, the training they did receive was sufficient to teach A.S.

The ALJ found that the District's evaluation was appropriate and that the IEP it crafted for A.S. did not deny her a FAPE. The ALJ gave Anthony's testimony little weight because she "d[id] not have education, training, and experience in special education, ha[d] little experience writing IEP goals, ha[d] not met [A.S.] or talked to her teachers, and ha[d] only reviewed samples of [A.S.'s] work provided by the [p]arents without an understanding of what the samples represented." The ALJ concluded that the District was not required to specifically assess A.S. for dyslexia because it identified A.S. as having a specific learning disability, that dyslexia is but "one example of a larger group of specific learning disabilities," and that testing in dyslexia was not necessary to determine this student's educational needs.

A.S.'s parents then filed a complaint in the United States District Court for the Western District of Washington. Following cross-motions for summary judgment, the district court granted summary judgment in the District's favor and upheld the ALJ's order. Crofts appeals.

## III.  Standard of Review

The question of whether a school district's IEP provided a FAPE is reviewed de novo. *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1207 (9th Cir. 2008). In IDEA cases, the district court's findings of fact are reviewed for clear error, even when they are based on the administrative record. *J.G. v. Douglas Cnty. Sch. Dist.*, 552 F.3d 786, 793 (9th Cir. 2008). Unlike other cases reviewing administrative action, in IDEA cases, the Ninth Circuit "do[es] not employ

a highly deferential standard of review"; rather, it gives "'due weight' to the state administrative proceedings." *Id.* (quoting *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (9th Cir. 2007)). And it gives "particular deference to 'thorough and careful' administrative findings." *Id*. (quoting *R.B. ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007)). As the party seeking relief, the appellant bears the burden of demonstrating that the ALJ's decision was incorrect. *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010).

## IV. Discussion

### A. The ALJ gave adequate weight to Crofts's expert witness.

As a preliminary matter, we afford deference to the ALJ's decision to discount A.S.'s expert witness testimony. Anthony did not evaluate A.S. or speak to her teachers, rendering her opinions about whether this student received a FAPE less weighty than the opinions of A.S.'s teachers and district administrators who evaluated and observed her. *See Hellgate*, 541 F.3d at 1212 (holding it was "reasonable for the hearing officer to rely on the testimony of [the school's] witnesses because they had observed [the student's] school performance" in contrast to parents' expert witnesses who "based their opinions predominantly upon file reviews"). Crofts's contention that Anthony did not need to meet A.S. to provide competent testimony on the unique needs of students with dyslexia generally is also unconvincing. Anthony's categorical opinions about the proper teaching method for all children with dyslexia were properly discounted based on her lack of special-education credentials and inexperience writing IEPs. The ALJ thoroughly and carefully evaluated Anthony's testimony against those of teachers and administrators who worked

with A.S., and we give deference to her determination that Anthony's testimony deserved little weight.

## B.  The District did not violate the IDEA.

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education." *Fresno Unified*, 626 F.3d at 432 (quoting *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992)).  Schools that accept IDEA funds must maintain "policies and procedures ensuring that a 'free appropriate public education' is available to all children with disabilities between the ages of three and twenty-one." *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1110 (9th Cir. 2016) (quoting 20 U.S.C. § 1412(a)(1)(A)).  To provide a FAPE to all children with disabilities, states must "first identify those children and evaluate their disabling conditions." *Id*.  Once identified, "those children must be evaluated and assessed for all suspected disabilities so that the school district can begin the process of determining what special education and related services will address the child's individual needs." *Id*. (citing 20 U.S.C. §§ 1412(a)(7), 1414(a)–(c)).  For the child to be deemed eligible for services, the team of school officials evaluating her must conclude that the child has at least one of the qualifying disabilities enumerated in the IDEA and defined by federal regulations.  20 U.S.C. § 1401(3)(A); 34 C.F.R. § 300.8; *see also* Wash. Admin. Code § 392-172A-01035(1)(a).

If the district determines that the child is eligible to receive special-education services, a team consisting of the child's parents, teachers, evaluators, and administrators creates "a written document that states the child's present levels of academic achievement and functional performance, creates measurable annual goals for the child, describes the

child's progress toward meeting the annual goals, and explains the services that will be provided to the child to help [her] advance toward attaining [her] particular goals." *Timothy O.*, 822 F.3d at 1111 (citing 20 U.S.C. § 1414(d)(1)(A)).  This document is known as the IEP.

"[A] state must comply both procedurally and substantively with the IDEA." *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 644 (9th Cir. 2005).  The court engages in a two-step inquiry to determine whether a child has received a FAPE.  *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 890 (9th Cir. 2001).  It determines first whether the IDEA's procedures were complied with and second whether the district met its substantive obligation to provide a FAPE.  *Id.*  "While some procedural violations can be harmless, procedural violations that substantially interfere with the parents' opportunity to participate in the IEP formulation process, result in the loss of educational opportunity, or actually cause a deprivation of educational benefits 'clearly result in the denial of a [FAPE].'"  *Timothy O.*, 822 F.3d at 1118 (quoting *Amanda J.*, 267 F.3d at 892).  To meet its substantive obligation under the IDEA, a school must offer an IEP "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist.*, 137 S. Ct. 988, 1001 (2017).

## 1.  The District satisfied the IDEA by evaluating the student for a "specific learning disability."

Crofts's core contention is that the District should have formally evaluated A.S. for dyslexia instead of evaluating her for a specific learning disability and that its failure to do so violated the District's obligation to evaluate her in "all areas of suspected disability."  20 U.S.C. § 1414(b)(3)(B). "Specific learning disability" is one of the enumerated

disability-eligibility categories in the IDEA and is defined as "a disorder in 1 or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations." *Id.* § 1401(30)(A). The category includes "such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, *dyslexia,* and developmental aphasia." *Id.* § 1401(30)(B) (emphasis added).[2] The District's evaluation report for A.S. quoted the outside evaluator's definition of dyslexia as a "language-based learning disability" that "refers to a cluster of symptoms, which result in people having difficulties with specific language skills, particularly reading."

Crofts's insistence that the District should have evaluated A.S. for dyslexia rather than recognizing her difficulties with reading, writing, and spelling under the broader "specific learning disability" category is based on a distinction without a difference. Medical and psychiatric dictionaries describe dyslexia as "a general term for primary reading disorder." *The Merck Manual of Diagnosis and*

---

[2] The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-5) contains a definition for the diagnosis of a "specific learning disorder" but does not recognize dyslexia as a separate disorder or diagnosis. Within the specific-learning-disorder listing, the DSM-5 contains a diagnostic code for a specific learning disorder "[w]ith an impairment in reading," characterized by problems with word reading accuracy, reading rate or fluency, and reading comprehension. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) 67 (5th ed. 2013) (diagnostic code F81.0). Within that category of specific learning disorder, the DSM-5 notes that dyslexia is "an alternative term used to refer to a pattern of learning difficulties characterized by problems with accurate or fluent word recognition, poor decoding, and poor spelling abilities." *Id.*

*Therapy* 3042 (19th ed. 2011); *see also* Robert J. Campbell, *Campbell's Psychiatric Dictionary* 310–12 (9th ed. 2009) (defining dyslexia as a "reading disorder; usually grouped within the learning disorders or academic skills disorders when it occurs as a developmental disability"); Narriman C. Shahrokh, Robert E. Hales, Katharine A. Phillips, & Stuart C. Yudofsky, *The Language of Mental Health: A Glossary of Psychiatric Terms* 90 (1st ed. 2011) (defining dyslexia as "[i]nability to read or difficulty in reading, including word blindness and a tendency to reverse letters and words in reading and writing"). The District conducted a battery of assessments to evaluate A.S.'s reading and writing skills— areas that dyslexia can impact—and determined that she needed special-education services to address deficiencies in those areas. It also considered and incorporated the outside evaluator's assessments that tested for difficulties with A.S.'s phonological processing, which is a particular area often included within the term dyslexia. Crofts fails to point to any other assessment or evaluation that the District could have administered to demonstrate that A.S. had dyslexia. Nor does Crofts demonstrate that the educational difficulties A.S. faced because of her language-related specific learning disability were so different from those faced by children with other reading- and writing-related specific learning disabilities that the District was required to make different findings, denominated by the term "dyslexia," in order to comprehensively evaluate her needs.[3]

---

[3] Crofts cites two Department of Education resources—an October 23, 2015, Dear Colleague Letter addressing dyslexia and the Letter to Unnerstall, *see supra* n.1—to argue that the District should have evaluated A.S. for dyslexia. Both letters merely explain that the IDEA does not *prohibit* the use of terms like dyslexia in evaluation reports. *See* Dep't of Educ., Off. of Special Educ. and Rehab. Servs., Dear Colleague Letter: Dyslexia Guidance 2 (Oct. 23, 2015); Dep't of Educ. Off. of

Crofts invokes three of our previous cases, *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877 (9th Cir. 2001), *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202 (9th Cir. 2008), and *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105 (9th Cir. 2016), to support her argument that the District failed to evaluate A.S. for suspected dyslexia in violation of 20 U.S.C. 1414(b)(3)(B). In all three cases, the defendant school districts failed to evaluate students for suspected autism. In *Amanda J.*, the district had information in its records indicating that the student may have had autism, but it did not assess her for the same and failed to disclose those records to her parents. *Amanda J.*, 267 F.3d at 893–95. In *Timothy O*, the district was on notice that the student "displayed symptoms" of autism but did not evaluate him for it. *Timothy O.*, 822 F.3d at 1118–20. And in *Hellgate*, the district was on notice that the student "likely suffered from some form of autism" but failed to obtain its own evaluation and instead referred the student's parents to an outside organization for testing. *Hellgate*, 541 F.3d at 1209. None of these scenarios is analogous to the District's evaluation here because the District did evaluate A.S. for suspected impairments in reading and writing and considered the outside evaluator's findings implicating dyslexia. The District's evaluation is not deficient merely because it did not use the term "dyslexia" in the manner Crofts would have preferred. We therefore conclude that the District did not procedurally

---

Special Educ. and Rehab. Servs., Letter to Kelli Unnerstall 1–2 (Apr. 25, 2016). Neither suggests that districts must evaluate for "dyslexia" rather than for a language-related specific learning disability. Indeed, the Letter to Unnerstall highlights that the IDEA does not require districts to affix any particular label or diagnosis to a student's evaluation "so long as the child is regarded as having a disability and receives needed special[-]education and related services." Letter to Unnerstall at 1 (citing 34 C.F.R. § 300.111(d)).

violate the IDEA when it found A.S. eligible for language-related services under the "specific learning disabilities" category rather than using the term "dyslexia."

**2. The District's IEPs were reasonably calculated to help A.S. progress without using the parents' preferred teaching method.**

Crofts also contends that the District's IEP denied A.S. a FAPE because she would have progressed more had she been taught using the Orton-Gillingham Approach. But a district is not required to use the methodology a parent prefers when providing special-education services for a child. School districts are "entitled to deference in deciding what programming is appropriate as a matter of educational policy." *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 945 n.5 (9th Cir. 2010); *see also Board of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 208 (1982) ("[O]nce a court determines that the requirements of the [IDEA] have been met, questions of methodology are for resolution by the States."); *R.P. ex rel. C.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1122 (9th Cir. 2011) ("The IDEA accords educators discretion to select from various methods for meeting the individualized needs of a student, provided those practices are reasonably calculated to provide him with educational benefit."). Districts need not specify an instructional method unless that method is necessary to enable a student to receive a FAPE. *Mercer Island*, 592 F.3d at 952. Rather, to meet its substantive obligations, a district must merely provide an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 1001.

Crofts has not demonstrated that the Orton-Gillingham Approach, in particular, was necessary for A.S. to receive

appropriate, individualized instruction. The record shows that A.S.'s IEPs were reasonably calculated to enable her to make progress in light of her disability without that methodology. They set goals that measured her ability to "apply phonetic princip[les] to read," improve reading-fluency skills, improve "sight word vocabulary," improve reading-comprehension skills, "write grade appropriate sentences," and use correct punctuation when writing. These goals were based on numerous reading and writing assessments conducted by the District and the parents' outside evaluator, and they were reasonably calculated to target the specific areas in which A.S. struggled. In addition to providing A.S. other accommodations, her teachers used reading programs designed to improve her reading comprehension and fluency, including multi-sensory, kinesthetic reading programs adapted from the principles of the Orton-Gillingham Approach and similar to the instructional method recommended by Crofts's expert.

The record also reflects that A.S. made appropriate educational progress without the Orton-Gillingham Approach. Under her 2015 IEP, A.S. began progressing quickly in her special-education instruction and in the general-education classroom. She progressed multiple levels in the school's reading-assessment program. While she did not meet all of her IEP goals, she made meaningful progress toward them. That she did not meet all grade-level expectations is not determinative. The IDEA does not require that students with special-education services perform on par with students receiving general-education instruction. *Endrew F.*, 137 S. Ct. at 1001 (reiterating that the IDEA does not require that states provide children with disabilities "opportunities to achieve academic success, attain self-sufficiency, and contribute to society that are substantially equal to the opportunities afforded children without

disabilities" (citation omitted)).  Instead, it requires that an IEP be tailored to a student's circumstances and reasonably calculated to help that student progress in light of those circumstances.  The District met that standard here.

## V. Conclusion

The District correctly evaluated A.S. for a specific learning disability and therefore was not required to provide an IEE at the public's expense.  It also met its substantive obligation to provide A.S. with a FAPE during her second- and third-grade years.  The district court's order granting summary judgment in favor of the District, therefore, is **AFFIRMED**.