**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TIMOTHY O., individually;
AMY O., individually; L. O.,
Timothy O. as guardian ad
litem for his minor,
*Plaintiffs-Appellants*,

v.

PASO ROBLES UNIFIED
SCHOOL DISTRICT,
*Defendant-Appellee.*

No. 14-55800

D.C. No.
2:12-cv-06385-JGB-JEM

OPINION

Appeal from the United States District Court
for the Central District of California
Jesus G. Bernal, District Judge, Presiding

Argued and Submitted December 7, 2015
Pasadena, California

Filed May 23, 2016

Before: Stephen Reinhardt, John T. Noonan,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Reinhardt

## SUMMARY[*]

### Individuals with Disabilities Education Act

The panel reversed the district court's judgment in favor of the defendant school district in an action brought under the Individuals with Disabilities Education Act.

The panel held that the school district violated the procedural requirements of the IDEA by failing to formally assess a student for autism, even though this was an area of suspected disability. As a result, the school district was unable to design an educational plan that addressed the student's unique needs, and it denied him a free appropriate public education. The panel remanded for determination of an appropriate remedy.

### COUNSEL

Marcy J.K. Tiffany (argued), Tiffany Law Group, Torrance, California, for Plaintiffs-Appellants.

Diane Beall (argued), Kronick, Moskovitz, Tiedmann & Girard, Sacramento, California, for Defendant-Appellee.

Sarah Erickson André, Michael P. Curtis, and Irene Tatevosyan, Nixon Peabody LLP, Los Angeles, California, for Amicus Curiae Learning Rights Law Center.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Maureen R. Graves, Fountain Valley, California, as and for Amicus Curiae California Association of Parent-Child Advocacy.

Selene Almazan-Altobelli, Towson, Maryland, as and for Amicus Curiae Council of Parent Attorneys and Advocates.

Jan E. Tomsky and Chad J. Graff, Fagen Friedman & Fulfrost LLP, Oakland, California, for Amicus Curiae California School Boards Association's Education Legal Alliance.

## OPINION

REINHARDT, Circuit Judge:

The Center for Disease Control and Prevention estimates that nearly one in sixty-eight children has autism spectrum disorder, a neurodevelopmental disorder that is characterized, in varying degrees, by difficulty communicating and socializing and by restricted repetitive behavior, interests, and activities.[1] The disorder is present from birth, or very early in development, and affects children's ability to communicate ideas and feelings, to use their imagination, and to develop relationships with others. Every individual with autism spectrum disorder is unique, although the main characteristics in children—behavioral deficits in eye contact, responding to one's name, joint attention behavior, pretend play, imitation,

---

[1] *See* CDC Autism and Developmental Disabilities Monitoring Network, *Prevalence of Autism Spectrum Disorder Among Children Aged 8 Years* (Mar. 28, 2014), http://www.cdc.gov/mmwr/preview/mmwrhtml/ss6302a1.htm?s_cid=ss6302a1_w.

nonverbal communication, and language development—are measurable by eighteen months of age.[2]

Early diagnosis and intervention is critical for the education of children with autism. In fact, with early and appropriate intervention, as many as 25% of children with early autism will, at an early age, no longer meet the criteria for that disorder. For the remaining children, intervention in the child's preschool years greatly increases the likelihood that the child will learn to verbally communicate. Indeed, the success of early intervention techniques has lowered the number of autistic children who will remain non-verbal throughout their lifetime to fewer than 10%, down from roughly 50% in the 1980s. Early intervention also minimizes the secondary symptoms and disruptive behavior, such as aggression, tantrums, and self-injury, that are displayed by children with the disorder. If left untreated, however, symptoms of autism spectrum disorder can become more severe and require extensive and expensive therapeutic interventions.[3]

---

[2] *See Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 882–83 (9th Cir. 2007).

[3] *See* Lynn Kern Koegal et al., *The Importance of Early Identification and Intervention for Children with or at Risk for Autism Spectrum Disorders*, 16.1 INT'L J. OF SPEECH-LANGUAGE PATHOLOGY 50, 51–52 (2014). *See also* Gary E. Marchant & Jason S. Robert, *Predictive Health Technologies: Genetic Testing for Autism Predisposition: Ethical, Legal and Social Challenges*, 9 HOUS. J. HEALTH L. & POL'Y 203, 208–11 (Spring 2009).

Luke[4] is a child with autism.[5] Under the Individuals with Disabilities Education Act ( "IDEA" or "the Act"), 20 U.S.C. §§ 1400–1487, the defendant Paso Robles Unified School District ("Paso Robles") became responsible for providing Luke with a free appropriate public education ("FAPE") when he turned three years old. In order to ensure that children with disabilities receive an appropriate education tailored to their unique condition, the IDEA requires that when a school district is afforded reason to suspect that a child has a disability, it "conduct a full and individual initial evaluation" that ensures the child is assessed for "all areas of suspected disability," using a variety of reliable and technically sound instruments. 20 U.S.C. §§ 1414(a)(1), (b)(2)–(3). At the time of Luke's initial evaluation, Paso Robles was aware that Luke displayed signs of autistic behavior, and therefore, autism was a suspected disability for which it was required to assess him. It chose, however, not to formally assess him for autism because a member of its staff opined, after an informal, unscientific observation of the child, that Luke merely had an expressive language delay, not a disorder on the autism spectrum. We hold that, in so doing, Paso Robles violated the procedural requirements of the

---

[4] In the caption, Luke is named "L.O." In his brief on appeal, as in this opinion, he is referred to as Luke.

[5] At the time this case was filed, "autism spectrum disorder" was not recognized as a single disorder, but rather, as subgroups associated with the severity of the person's symptoms: Autistic Disorder, Asperger's Disorder, Childhood Disintegrative Disorder, and Pervasive Developmental Disorder Not Otherwise Specified. Since the 2013 revisions to the Diagnostic and Statistical Manual of Mental Disorders, however, these subgroups have been replaced by the umbrella term "autism spectrum disorder." Throughout this opinion, the original subgroups will generally be referred to individually and collectively as "disorders on the autism spectrum" or "autism."

IDEA and, as a result, was unable to design an educational plan that addressed Luke's unique needs. Accordingly, we hold that Paso Robles denied Luke a free appropriate public education, and remand for the determination of an appropriate remedy.

## STATUTORY AND REGULATORY BACKGROUND

The Individuals with Disabilities Education Act (originally the Education for All Handicapped Children Act), was designed to reverse a history of educational neglect for disabled children. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 52 (2005) (citing H.R. Rep. No. 94-332, p. 2 (1975)). At the time of its passage, the need for institutional reform was pervasive: millions of children with a multitude of disabilities were entirely excluded from public schools, and others, while present, could not benefit from the experience because of undiagnosed—and therefore unaddressed—disabilities. *See* 20 U.S.C. § 1400(c)(2).

With the goal of remedying these systemic problems, the Act conditions the receipt of federal funds on States' maintenance of policies and procedures ensuring that a "free appropriate public education" is available to all children with disabilities between the ages of three and twenty-one. *Id.* § 1412(a)(1)(A).[6] A free appropriate public education requires the provision of "specially designed instruction, at

---

[6] A "child with a disability" is one who has either intellectual disabilities, hearing impairments, speech or language impairments, visual impairments, serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities, and who, by reason thereof, needs special education and related services. 20 U.S.C. § 1401(3)(A).

no cost to the parents, to meet the unique needs of a child with a disability," *id.* § 1401(9) & (29), as well as transportation, developmental, corrective and other supportive services required to ensure that the child benefits from that special education, *id.* § 1401(26).

### *Identification and Evaluation of Children with Disabilities*

In order to provide a free appropriate public education to all children with disabilities States must, of course, first identify those children and evaluate their disabling conditions. Accordingly, the IDEA requires that every State have procedures in place that are designed to identify children who may need special education services. *Id.* § 1412(a)(3)(A). Once identified, those children must be evaluated and assessed for all suspected disabilities so that the school district can begin the process of determining what special education and related services will address the child's individual needs. *See id.* §§ 1412(a)(7), 1414(a)–(c).

That this evaluation is done early, thoroughly, and reliably is of extreme importance to the education of children. Otherwise, many disabilities will go undiagnosed, neglected, or improperly treated in the classroom. *See id.* § 1400(c). For this reason, the IDEA requires that local school districts[7] must "conduct a full and individual initial evaluation" of a

---

[7] Specifically, the statute requires that the initial evaluation be conducted by a "State educational agency, other State agency, or local educational agency." A State educational agency is the State agency primarily responsible for the State supervision of public schools. 20 U.S.C. § 1401(32). Generally, a "local educational agency" is synonymous with the local school district. *See id.* § 1401(19). Thus, for simplicity's sake, this opinion will refer simply to "school districts," or "the district."

child "*before* the initial provision of special education and related services" to that child. *Id.* § 1414(a)(1)(A) (emphasis added).**[8]**   Furthermore, the IDEA and its accompanying regulations contain an extensive set of procedural requirements that are designed to ensure that this initial evaluation (as well as any subsequent reevaluations) achieves a complete  result that can be reliably used to create an appropriate and individualized educational plan tailored to the needs of the child.

First, the initial evaluation must be designed not only to determine whether the child has a disability, but also "to gather relevant functional, developmental, and academic information about the child," that can be used to determine the child's individual educational needs.   34 C.F.R. § 300.304(b)(1); 20 U.S.C. § 1414(a)(1)(C).   The school district must, therefore, "ensure that– . . . the child is assessed in *all areas* of suspected disability."   20 U.S.C. § 1414(b)(3)(B) (emphasis added).  Anything less would not provide a complete picture of the child's needs.

Second, the local school district must provide notice to the child's parents that describes "*any* evaluation procedures"

---

**[8]** Any parents who have reason to suspect their child may have a disability may request such an initial evaluation.  34 C.F.R. § 300.301(b). If the school district wishes to deny the request, it must provide written notice to the parents explaining that it refuses to conduct an initial evaluation and provide an explanation as to why it does not suspect the child has a disability and what records or evaluations it used as the basis for its decision.   34 C.F.R. § 300.503(a) & (b).  A parent may then challenge this decision by requesting a due process hearing under 34 C.F.R. § 300.507 or filing a State complaint under 34 C.F.R. § 300.153.  The school district may also initiate an evaluation *sua sponte* if it seeks and receives parental consent.  34 C.F.R. § 300.301(b).

that the district proposes to conduct, as well as why it has made those decisions. 20 U.S.C. § 1414(b)(1) (emphasis added); 34 C.F.R. § 300.304(a). The statute further requires, *inter alia*, that in conducting the evaluation, school districts must:

1. Use a "variety of assessment tools and strategies" without relying on "any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program for the child," 20 U.S.C. § 1414(b)(2)(A) & (B);

2. Use "technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors," *id.* § 1414(b)(2)(C); and

3. Ensure that all assessments are conducted by trained and knowledgeable personnel, in accordance with instructions provided by the producer of the assessment, and for purposes which the assessments or measures are valid and reliable, *id.* § 1414(b)(3)(A).

Upon completion of this full and individual initial evaluation, the school district shall provide a copy of the evaluative report to the child's parents. *Id.* § 1414(b)(4)(B). If the parents disagree with the school district's evaluation of their child, they have a right to "obtain an independent educational

evaluation" or "IEE" at public expense.   20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502.

### *Creation of an Individualized Education Program ("IEP")*

The results of the initial evaluation are critical to the next step of the process:  the creation of an individualized education program or "IEP."  The IEP is a written document that states the child's present levels of academic achievement and functional performance, creates measurable annual goals for the child, describes the child's progress toward meeting the annual goals, and explains the services that will be provided to the child to help him advance toward attaining his particular goals.  20 U.S.C. § 1414(d)(1)(A).  It is created by a child's "IEP Team"—which consists of the child's parents, teachers, evaluators, and administrators, *see generally Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524 (2007)—after the team has considered the child's strengths, the parents' concerns about the child's education, and the results of the school district's initial evaluation of the child, which (if done appropriately) provides a complete picture of the child's specific academic, developmental, and functional needs.  *See* 20 U.S.C. § 1414(d)(3)(A)(iii); 34 C.F.R. § 300.304(b)(1).

Although the IDEA gives discretion to school districts to create and execute appropriate educational programs for children with disabilities, the IDEA requires that parents be afforded a significant and collaborative role in the development of a child's IEP.  *Winkelman*, 550 U.S. at 524. To that end, the IDEA contains a significant number of procedural safeguards that are designed to ensure that the child's parents have sufficient information to understand and

participate meaningfully in all aspects of that discussion. *See M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842, 851 (9th Cir. 2014). It requires, among other things, that school districts provide copies of the initial evaluative report to the parents, 20 U.S.C. § 1414(b)(4), thoroughly document all information used to evaluate the educational needs of the child, 34 C.F.R. § 300.306(c)(1), and provide parents with an opportunity to examine all of their child's records. 20 U.S.C. § 1415(b)(1).

It also requires that parents be given formal, written notice whenever the school district intends to change or refuses to change the identification, evaluation, or educational placement of their child. *Id.* § 1415(b)(3). That notice must not only describe the action proposed or refused by the agency, but also explain why the agency proposes or refuses to take the action, as well as the records or assessments that the agency used as a basis for its decision. 34 C.F.R. § 300.503(a) & (b).

Further, any parent who is dissatisfied with the identification, evaluation, or educational placement of the child must have the opportunity to present a formal complaint. 20 U.S.C. § 1415(b)(6). Whenever a complaint is filed, the school district must convene a meeting with the parents and members of the IEP Team during which the parents may discuss the complaint and give the school district the opportunity to resolve it. *Id.* § 1415(f)(1)(B)(i). If the school district does not resolve the complaint to the satisfaction of the parents within thirty days, the parents have the right to an impartial due process hearing before an administrative law judge. *Id.* § 1415(f)(1)(B)(ii). Any party aggrieved by the findings and decision rendered at the

hearing may appeal to the state educational agency or may b ring a civil action in federal court. *Id.* § 1415(i)(2)(A).**⁹**

## FACTUAL BACKGROUND

Luke, an autistic child, was five years old when this case was originally filed. He displayed symptoms of a developmental disorder early in life, and in March 2009, when he was twenty-seven months old, he began to receive speech, language, and occupational therapy at the Tri-Counties Regional Center ("Tri-Counties"). Tri-Counties, like all regional centers in California, is a nonprofit private corporation that contracts with the Department of Developmental Services to provide early intervention services for at-risk infants and toddlers.**¹⁰** California children under the age of three qualify for services at regional centers if they have a "developmental delay in one or more of the following five areas: cognitive development; physical and motor development, including vision and hearing; communication development; social or emotional development; or adaptive development" or if they suffer from "conditions of known etiology or conditions with established harmful developmental consequences." Cal. Gov't Code § 95014.

After the age of three, local school districts become responsible for the education of children with disabilities. 20 U.S.C. § 1412. In California, however, children can also

---

**⁹** To ensure that parents are aware of these rights, school districts are required to provide parents an explanation of these procedural safeguards. 20 U.S.C. § 1415(c)(1)(C).

**¹⁰** Cal. Dep't Dev. Serv., *Information About Regional Centers*, http://www.dds.ca.gov/RC/Home.cfm.

continue to receive services at private regional centers if they have "mental retardation, autism, epilepsy, cerebral palsy, or a condition that is similar to mental retardation or requires similar treatment." Cal. Welf. & Inst. Code § 4512. At least at the time of the events in this case, that meant that children with Autistic Disorder, but not any other disorder on the spectrum, were eligible for continued regional center services.[11] In contrast, under the IDEA and the California law that supplements that Act, local school districts have at all times been required to provide special education services to a much broader category of children, including any child who manifests autistic-like behavior, regardless whether he or she has been formally diagnosed with Autistic Disorder. *See* 34 C.F.R. § 300.8(c)(1); Cal. Educ. Code § 56846.2(a).[12]

---

[11] As noted *supra* note 3, at the time of the events in this case, "autism spectrum disorder" was not yet recognized as a single disorder. Although the California Department of Developmental Services did not take a formal position as to whether 'autism' in the California statute regarding regional centers referred to *any* disorder on the spectrum or merely Autistic Disorder, it filed briefs supporting the decisions of regional centers not to offer continued services to children with disorders other than Autistic Disorder. This ultimately resulted in the California Court of Appeal concluding, in an unpublished decision, that "autism" in this statute was synonymous with Autistic Disorder. *See Brian S. v. Delgadillo*, 2010 WL 2933624 (Cal. App. 2010) (unpublished). It is not clear what effect, if any, the recent changes to the Diagnostic and Statistical Manual would have on this interpretation.

[12] The IDEA requires that local school districts provide special education services to children with autism, but allows the States to define what qualifies as autistic for the purpose of special education. Some states, for example, follow the medical definition found in the Diagnostic and Statistical Manual. In California at the time of the events in this case, any child who displayed two of seven listed types of autistic-like behavior qualified as 'autistic' for the purpose of receiving special education through local school districts, regardless whether the child had been

After three months of Luke's receiving services at Tri-Counties, his parents had a meeting with staff from Tri-Counties and Paso Robles to discuss what would happen when Luke turned three years old. During that meeting, Paso Robles scheduled a date on which it would conduct an initial assessment to determine whether Luke was a child with a disability and therefore qualified for special education and related services under the IDEA. Paso Robles' notes of that meeting reflect that the group discussed how Luke seemingly had no health needs, but that there were concerns about his speech, and that Tri-Counties would perform a psychological assessment of Luke—presumably to test for Autistic Disorder—in order to determine whether he qualified for further regional center services.[13]

On October 30, 2009, a few weeks before Luke's third birthday, Paso Robles conducted Luke's initial evaluation.

---

formally diagnosed with any disorder on the spectrum.   5 C.C.R. § 3030(g) (2009).

[13] Although Paso Robles' records do not state precisely what Tri-Counties wanted to test Luke for, Autistic Disorder seems to be the only true possibility. If Luke had "no health needs," he certainly would not qualify for further regional center services as a child with either epilepsy or cerebral palsy. Further, nothing in the record suggests that he displayed any signs of mental retardation "or a condition that is similar to mental retardation," which are the only other conditions, aside from autism, that would have qualified him for continued regional center services. The conclusion that Tri-Counties wanted to perform a psychological assessment for Autistic Disorder, and, in fact, discussed that possibility with Paso Robles at the June 2009 meeting is also made clear by the fact that (1) Paso Robles conceded in the district court that it "was aware" that the Regional Center suspected Luke was autistic before it conducted its own assessment, and (2) Tri-Counties ultimately assessed Luke for autism but not for any other disabilities.

According to the notice provided to Luke's parents, Luke was to be assessed by Christie Youngdale, a resource specialist for Paso Robles, and Lisa Stinson, a speech and language therapist, for academic/pre-academic achievement, sensory-motor development, communication development, and health issues. He was not, the notice reflected, to be given any assessments under the category of "social/adaptive behavior," the category covering disorders on the autism spectrum.

Youngdale and Stinson observed Luke and tried to engage him in play, but their attempts to utilize standard assessment tools were unsuccessful because of his "compliance" issues. During the assessment, William Peck, a Paso Robles psychologist, stopped by and observed Luke for approximately thirty to forty minutes. Although the notice to Luke's parents mentioned nothing about Peck's involvement, Peck later testified that he came to observe in order to "consult with the staff in terms of possible handicapping conditions which may be – may have or may not have been present." Specifically, he later admitted, "there was a possibility of looking at autism as a handicapping condition." Rather than schedule a formal assessment for that condition, however, Peck merely observed Luke in order to advise Paso Robles' staff whether it needed to conduct a full and formal test for autism. This was, apparently, his standard practice. Peck at no point explained the purpose of his visit to Luke's parents. Indeed, during the observation, he did not communicate at all with either Luke or his parents, who were present while the tests were administered.

From his cursory observation, during which he did not utilize any standard assessment tools, Peck concluded that there was no need for Paso Robles to formally assess Luke for any disorder on the autism spectrum because he saw Luke

use a "variety of facial expressions," display emotions, and demonstrate his "skill at turn-taking." In Peck's opinion, this was uncharacteristic of a child with a disorder on the autism spectrum. Relying on this informal advice, Paso Robles concluded that Luke had only an expressive language impairment—not autism—and without taking any steps to assess Luke for autism or autistic-like behaviors, or to ensure that he would be so assessed, it scheduled an initial IEP meeting for early December 2009.[14] At no point, however, did Paso Robles explain to Luke's parents that it had thought about assessing Luke for autism, and indeed, had called Peck in to observe for that reason. Nor did it explain that it had decided not to formally assess Luke for autism based on Peck's recommendation.

On November 18, 2009, Tri-Counties performed a psychological assessment of Luke to determine whether he had Autistic Disorder and therefore qualified for continued regional center services after the age of three. Dr. Linda Griffin's final report concluded that:

> Luke has some autistic symptoms which are a concern. He has significantly delayed expressive language; he is also not exhibiting varied and frequent social pretend play, with the exception of transportation toys. He prefers to play alone much of the time. His joint attention to adult directed tasks is poor

---

[14] On November 10, Paso Robles called Tri-Counties asking if it had assessed Luke. Tri-Counties told Paso Robles that it had not yet received consent from Luke's parents to conduct an assessment. That same day, Paso Robles sent invitations to the IEP meeting, demonstrating its intent to proceed to the IEP meeting without an assessment for autism.

generally speaking, however there are exceptions seemingly dependent on the nature of the activity . . . It is difficult to get his attention.   . . . With the exception of his expressive language delay which is very pronounced, the severity of the other symptoms above are mild in my opinion; however, taken together, they stand in contrast to a child with only a language disorder.

She provisionally diagnosed Luke with Pervasive Developmental Disorder, Not Otherwise Specified ("PDD-NOS"), a disorder on the autism spectrum, and opined that potentially, with "therapeutic intervention[]" Luke might no longer meet the criteria for that disorder, but that "[i]t is very important that he receive *appropriate interventions* that address his areas of concern" because "mild symptoms may become more pronounced over time."

Tri-Counties sent a copy of Dr. Griffin's report (hereinafter "Griffin Report") to Paso Robles, which received it on December 2, 2009, two days before the initial IEP meeting.  Despite its diagnosis and recommendation, the report was not discussed at the IEP meeting; nor did Paso Robles reevaluate its decision not to assess Luke for autism.[15]

---

[15] Paso Robles argues that the Griffin Report was "considered," at the IEP meeting, and indeed, the administrative law judge so found.  The sole support for this statement is a single question asked at the administrative hearing.  Peck, who was a member of the IEP Team, was asked "So did you consider that assessment at the 12/4/2009 IEP meeting?" and he responded "Yes."  Regardless whether Peck himself considered the Griffin Report at the meeting, there is no evidence that the assessment was discussed at the meeting as part of the collaborative process mandated by the IDEA.  The IEP itself does not mention the Griffin Report, and another

Indeed, Paso Robles contends that Dr. Griffin's diagnosis was insufficient to even create suspicion that Luke had a disorder on the autism spectrum because Peck's earlier observation of Luke had dispelled any suspicion that Luke had such a disorder and because Dr. Griffin's "provisional" diagnosis was not conclusive.

The IEP that was created as a result of the meeting identified Luke's disability as a "speech or language impairment," and set several goals for Luke to achieve in those areas, including a goal that he would begin speaking in small phrases, have a limited vocabulary of fifteen to twenty words, and use other nonverbal means to communicate. Luke was offered group speech and language services for twenty-five minutes, seven times a month, as well as placement in a preschool classroom that met two days a week for 1.5 hours each day. The IEP contained no mention of any disorder on the autism spectrum or even any possibility of such a disorder.

### The 2009–2010 School Year

Luke exhibited signs of extreme difficulty in his first year of school. He often refused to leave his mother's side and, according to her, displayed other problems in his classroom behavior. In February, Youngdale suggested that Luke should be transferred to a more intensive program. Ultimately, however, neither Paso Robles nor Luke's parents

---

member of Paso Robles' staff who testified at length about what was considered during the IEP meeting never once mentioned the Griffin Report. Further, Luke's mother testified that she did not know that the school district had received a copy of the report because it was never mentioned during the meeting.

called an IEP meeting to discuss such a change. Luke's mother also expressed concerns about aggressive and obsessive behavior outside the school, and asked his other teacher, Stinson, whether Luke might be autistic. Without scheduling an assessment, Stinson assured Luke's mother that he was not, but also suggested that Luke might make better progress in a more intensive program.

In May, another IEP meeting was held. The team agreed that Luke would attend a more intensive preschool program in the next year, but that he would not receive extended school year services over the summer.

### *The 2010–2011 School Year*

During the summer of 2010, Luke's parents had him privately evaluated by a speech and language pathologist, an occupational therapist, and a neurologist. Subsequently, his parents determined that he would not return to Paso Robles for preschool, and that instead, he would be educated at home utilizing the private services of a behaviorist. In October 2010, however, in part due to the cost of the private services, Luke returned to school.

Luke's IEP was amended to reflect that he would attend a preschool class taught by Noah Cooper. This class, which met three hours a day, had approximately eight students with mild to moderate language and social skill defects, some of whom had autism or exhibited autistic-like behavior. Luke began attending the class in November. While in Cooper's class, Luke would occasionally whisper to his peers, but would immediately stop speaking when an adult approached.

At an IEP meeting in December 2010, staff expressed concern that Luke was not talking to either adults or peers and suggested that he might have "selective mutism." Luke's parents reported that he was having tantrums at home, including crying and aggressive behavior. According to Peck, it was apparent from these complaints that Luke displayed several types of autistic-like behavior, which would ordinarily qualify him to receive special education services for autism, but he did not mention that possibility at the IEP meeting because:

> [W]e didn't have an assessment to address that disability. In other words, off the top of my head, I'm not going to be at an IEP meeting and say a kid has autism when I haven't done an assessment specifically using instruments standardized and developed to make that particular determination. I'm just not going to make that diagnosis off the top of my head.

Despite having previously expressed the view that Paso Robles did not need to assess Luke for disorders on the autism spectrum, Peck did not inform the IEP Team of his new concern or suggest that Luke should now be assessed for autism.[16]

---

[16] Peck at no point explained why he was previously able to make a diagnosis "off the top of [his] head" as to why Luke did not have autism without doing an assessment, but because he could not know the answer without an assessment, would not advise the participants at the IEP meeting that he now believed that Luke might have such a disability.

As the year progressed, Cooper continued to try to accommodate Luke's refusal to speak, and Luke's mother continued to communicate her concerns that Luke was demonstrating aggressive behavior at home. In January, her attorney sent a letter to Paso Robles informing the District that Luke had obtained legal representation and that his parents requested that the school fund an independent educational evaluation of Luke for autism. His parents also retained the services of Genevieve Sullivan, a behavior specialist, to observe Luke in class and had him privately assessed for autism by Dr. B.J. Freeman, a well-respected national expert on autism and autism-like disorders.

Dr. Freeman diagnosed Luke with Autistic Disorder. She determined that Luke needed a positive behavior support plan to address his problems, including his refusal to talk. Luke's mother testified that she told several members of Paso Robles' staff, including Luke's teacher, about this diagnosis. The next month, Paso Robles announced that it would finally do a formal and comprehensive evaluation of Luke, motivated by his parents seeking "some type of outside assessment." Paso Robles did not complete the assessment for almost an entire year, until January 2012, after which Peck opined for the first time that Luke had autistic-like behavior.

In the meantime, Luke's parents arranged for him to receive behavioral therapy from Sullivan's agency. Within a few short weeks, Luke began speaking to unfamiliar adults, and a few months later he was speaking in multi-word sentences to therapists, his parents, and non-family members who had never before heard him speak.

## PROCEDURAL BACKGROUND

On July 6, 2011, Luke's parents filed a request for a due process hearing with the Office of Administrative Hearings, alleging in relevant part that Paso Robles violated the procedural and substantive requirements of the IDEA and the California Education Code by (1) failing to assess Luke in all areas of suspected disability, specifically autism; and (2) failing to appropriately address his behavioral issues, such as refusing to speak, tantrums, and non-compliance, during the 2010–2011 school year.[17]  They further alleged that, by violating these requirements, the school denied Luke a free appropriate public education during the 2009–2010 and 2010–2011 school years. They requested, as a remedy for these violations, that Paso Robles pay for the private assessments and private behavioral services that Luke received, that it provide Luke with compensatory behavioral and speech services, and that it include the behavioral therapy recommended by Dr. Freeman as part of Luke's ongoing educational program.  His parents also withdrew Luke from school in a letter dated July 15, 2011.

---

[17] Plaintiffs raise both of these issues on appeal.  Because we hold that Paso Robles denied Luke a free appropriate public education by failing to assess him for autism, we do not reach the second question presented—whether the school district denied Luke a free appropriate public education by failing to address his behavioral issues. The plaintiffs also presented a host of other issues before the administrative law judge, including whether Luke should have been made eligible for special education under the category of "autistic-like," none of which is raised on this appeal.  Amicus Curiae California Boards Association's Education Legal Alliance asks us to hold that neither the IDEA nor California law entitles special education students to a particular diagnosis or "eligibility classification."  That question, however, is different from the question whether a school district must assess a child for all areas of suspected disability and, as noted, is no longer at issue in this case.

A multi-day hearing was held in March and April of 2012. On July 6, 2012, the administrative law judge ("ALJ") denied all of Luke's claims. Most relevant to the current appeal, the ALJ declined to address whether Paso Robles' October 2009 initial evaluation of Luke was deficient, and instead found that, "[b]ecause Dr. Griffin's report was so thorough, the District saw no need to conduct further assessments of [Luke], and relied heavily on the report." Without citing any authority, she held that Luke "failed to meet his burden of proof that the District should have assessed him in the areas of autism and behavior." Even if Paso Robles was required to assess for autism, the ALJ found, that failure was harmless because Paso Robles relied heavily on Dr. Griffin's assessment when creating Luke's IEP. The ALJ also concluded that Paso Robles did not need to assess Luke for autism or behavioral functioning in the 2010–2011 school year because Luke did not display any serious autistic-like behavior at school.

Luke's parents appealed the ALJ's decision to the United States District Court for the Central District of California. The district court affirmed the ALJ's decision, but adopted a different rationale. The district court concluded that Paso Robles "knew" that Tri-Counties suspected Luke might be autistic, but it did not need to formally assess Luke for autism because Peck observed him at his initial evaluation on October 30, 2009 and did not observe obvious characteristics of a child with autism. The district court also agreed with the ALJ that, even if Paso Robles was required to perform an assessment of Luke for autism, any failure to do so was harmless because Paso Robles "made appropriate recommendations" based on Dr. Griffin's report which assessed Luke for autism. Further, the court asserted, Paso Robles did not need to reassess Luke in 2010 because Luke's

parents never requested a reassessment, and because his teacher reasonably wanted to observe Luke for a longer period of time to determine what testing needed to be done. This appeal followed.

## STANDARD OF REVIEW

This case requires us to review both the decision of the district court and that of the administrative law judge. We review *de novo* the question whether a school district's proposed individualized education program provided a free appropriate public education. *Amanda J.*, 267 F.3d at 887. In doing so, we may review a district court's findings of fact only for clear error. *Id.* Further, we must offer "due weight" to the decisions of the state's administrative bodies, a standard which is far less deferential than judicial review of other agency actions, but rather, requires us to refrain from substituting our "own notions of sound educational policy for those of the school authorities which [we] review." *Id.* (quoting *Rowley v. Bd. of Educ.*, 458 U.S. 176, 206 (1982)).

## ANALYSIS

School districts may deny a child a free appropriate public education by violating either the substantive or procedural requirements of the IDEA. *M.M.*, 767 F.3d at 852. A school district denies a child a free appropriate public education by violating the IDEA's substantive requirements when it offers a child an IEP that is not reasonably calculated to enable the child to receive educational benefits. *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 432–33 (9th Cir. 2010). The school district may also, however, deny the child a free appropriate public education by failing to comply with the IDEA's extensive and carefully drafted procedures. *See*

*Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1043 (9th Cir. 2013). While some procedural violations can be harmless, procedural violations that substantially interfere with the parents' opportunity to participate in the IEP formulation process, result in the loss of educational opportunity, or actually cause a deprivation of educational benefits "clearly result in the denial of a [free appropriate public education.]" *Amanda J.*, 267 F.3d at 892.

Luke's primary contention on this appeal is that Paso Robles violated the IDEA's essential procedural requirement that it conduct an initial evaluation to assess a child "for all areas of suspected disabilities" when it failed to formally assess him for autism or autistic-like behavior. We agree and reject the district court's holding that, although Paso Robles was aware that Tri-Counties suspected Luke might be autistic, it did not need to assess him for autism because one of the District's staff members, William Peck, informally observed Luke and did not see him exhibit any such behavior. The IDEA requires that, if a school district has notice that a child has displayed symptoms of a covered disability, it must assess that child in all areas of that disability using the thorough and reliable procedures specified in the Act. School districts cannot circumvent that responsibility by way of informal observations, nor can the subjective opinion of a staff member dispel such reported suspicion. Further, we reject the ALJ's equivocal and unsupported statement that Paso Robles may not have needed to assess Luke for autism because it "knew" that Tri-Counties was going to assess him. There is no support for this finding in the record and, even if there were, Paso Robles took no steps to ensure that any assessment by Tri-Counties complied with the requirements of the IDEA imposed on the District. Under these circumstances, the potential Tri-Counties assessment could

not satisfy Paso Robles' obligation to conduct an IDEA-compliant individual initial evaluation prior to developing Luke's IEP and providing special education services to Luke.

Finally, we hold that Paso Robles' fundamental procedural violations denied Luke a free appropriate public education during the 2009–2010 and 2010–2011 school years because the District's failure to assess Luke for all areas of suspected disability deprived his IEP Team of critical evaluative information about his developmental abilities as an autistic child. That deprivation made it impossible for the IEP Team to consider and recommend appropriate services necessary to address Luke's unique needs, thus depriving him of critical educational opportunities and substantially impairing his parents' ability to fully participate in the collaborative IEP process. In so holding, we reject the argument advanced by both the district court and the ALJ that any failure to assess Luke for autism was rendered harmless by Paso Robles' reliance on the Griffin Report in creating Luke's IEP. There is no evidence in the record that Dr. Griffin's assessment was conducted with the intent of helping Luke's IEP Team to develop an appropriate educational plan or to gather all the necessary information required by the IDEA for that purpose. Nor is there any evidence that the Griffin Report was actually considered by Luke's team as part of the collaborative process mandated by the IDEA, or that the information it collected or its findings were incorporated into Luke's IEP. In fact, all the evidence is to the contrary. Accordingly, we reverse the decision of the district court and remand for the determination of an appropriate remedy.

### I. Paso Robles Failed to Conduct an Assessment for Autism, as Required by the IDEA

Under the IDEA, the school district must conduct a "full and individual initial evaluation," one which ensures that the child is assessed in "all areas of suspected disability," before providing that child with any special education services. 20 U.S.C. §§ 1414(a)(1)(A), 1414(b)(3)(B). The California Education Code, which incorporates the requirements of the IDEA into state law, similarly requires that the child be assessed "in all areas related to the suspected disability." *See* Cal. Educ. Code § 56320(f). As described earlier, this requirement serves a critical purpose: it allows the child's IEP Team to have a complete picture of the child's functional, developmental, and academic needs, which in turn allows the team to design an individualized and appropriate educational plan tailored to the needs of the individual child.

Our precedent establishes that a disability is "suspected," and therefore must be assessed by a school district, when the district has notice that the child has displayed symptoms of that disability. In *Pasatiempo by Pasatiempo v. Aizawa*, 103 F.3d 796 (9th Cir. 1996), for example, we held that the "informed suspicions of parents, who may have consulted outside experts," trigger the requirement to assess, even if the school district disagrees with the parent's suspicions because "[t]he identification [and assessment] of children who have disabilities should be a cooperative and consultative process." *Id.* at 802. Once either the school district or the parents suspect disability, we held, a test must be performed so that parents can "receive notification of, and have the opportunity to contest, conclusions regarding their children." *Id.*

Similarly, in *N.B. v. Hellgate Elementary School District*, 541 F.3d 1202 (9th Cir. 2008), we held that the requirement to assess may be triggered by the informed suspicions of outside experts. There, a young child was assessed by a professional for speech and language problems before the child began school. *Id.* at 1205–06. The professional concluded that an "autistic component" was complicating the child's performance, although the professional did not diagnose the child with a disorder on the autism spectrum. *Id.* at 1209. The child's parents delivered these records to the school district's special education director and discussed the evaluation with him, but the school district never arranged for the child to be assessed for autism. *Id.* at 1205–06. Instead, it referred the child's parents to a third party which would perform a free autism test for the parents. *Id.* at 1206. The school district, like Paso Robles, later claimed that it did not arrange for the child to be tested because it did not suspect that the child had autism. *Id.* at 1209. We held that the district's assertion of ignorance was plainly contradicted by the record because the school was aware (due to the prior evaluation) that autism was a possibility. *Id.* at 1209–10.

Here, the record shows that Paso Robles had notice that Luke displayed symptoms of autism. Both the ALJ and the district court found that Paso Robles was aware, before its initial evaluation of Luke in October 2009, that Tri-Counties believed that he might have a disorder on the autism spectrum.[18] Indeed, Peck admitted at the administrative

---

[18] Paso Robles now asserts that there is no basis to conclude that Tri-Counties told the District that it suspected Luke had autism. While the notes from the June 2009 meeting between Luke's parents, Tri-Counties, and Paso Robles do not specifically mention "autism," they do establish that Tri-Counties wanted to give Luke a psychological examination to see

hearing that autism was a suspected disability when he stated that he had been called to informally observe Luke's initial evaluation because there was a possibility of looking at autism as a disabling condition.

Despite this knowledge, when creating a plan for Luke's initial assessment, Paso Robles did not include any of the standard assessments for autism. Rather, the notice sent to Luke's parents reflected that he would *not* be given any assessment for social/adaptive behavior, which would be necessary in order to determine whether Luke had autistic-like symptoms. Instead, during the October 2009 initial assessment, Paso Robles attempted to assess Luke for several *other* disorders, but was unable to complete its tests of him because of Luke's "compliance" issues. At no point during its examination did Paso Robles conduct or attempt to conduct any form of standard or reliable assessment for autism or autistic-like behavior.

Moreover, even if Paso Robles had not had notice of Luke's autistic symptoms at the time of the October 30, 2009 initial assessment, it obtained such notice when it received the Griffin Report, which "provisionally" diagnosed Luke with a disorder on the autism spectrum and noted that he displayed troubling autistic behavior. Peck testified that he did not give much weight to Dr. Griffin's assessment because it was only a "provisional" diagnosis. Regardless of Paso

---

if he qualified for further regional center services, which he would qualify for only if he had mental retardation, epilepsy, cerebral palsy, or autism. The only plausible such disorder in Luke's case was autism. In any event, Paso Robles conceded in the district court that it was aware that Tri-Counties suspected Luke was autistic before it conducted its own assessment.

Robles' subjective opinion about the validity of Dr. Griffin's diagnosis, however, the "informed suspicions of . . . [a] consulted outside expert[]"—here, Dr. Griffin, whose report stated that Luke displayed troubling autistic behavior—establishes the statutory requirement of suspicion thus necessitating a full assessment for autism. *See Pasatiempo*, 103 F.3d at 802. Paso Robles still did not do so, and instead, two days later, held an IEP meeting during which neither autism nor the Griffin Report were ever discussed. Further, neither the possibility of autism nor the recommendations of the Griffin Report were incorporated into Luke's IEP.

Even more troubling, by the time of the December 2010 IEP, it was clear from parent and teacher complaints that Luke displayed autistic-like behavior at home and at school. Even then, Paso Robles did not suggest that Luke should be provided services to address his autistic-like behavior or even that Luke should be assessed for autism. This complete failure to assess Luke for all areas of suspected disability clearly and substantially violated the IDEA's procedural requirements.

### A. Peck's Informal Observation of Luke Could Not Satisfy Paso Robles' Obligation to Assess for Autism

Despite its clear notice of Luke's autistic-like behavior, Paso Robles argues that autism was not a "suspected disability" either at the time of its October 2009 initial assessment or after it received Dr. Griffin's assessment. The district court agreed, and held that while Paso Robles "knew that [Tri-Counties] suspected that [Luke] may be autistic," it did not need to formally assess Luke because it had requested that its staff member, Peck, observe informally Luke's

assessment for other disorders and determine whether additional testing was needed. According to Peck, he saw Luke display behavior that was not characteristic of a child with autism, and therefore advised the district that no additional assessment was necessary. Specifically, the district court wrote, it was "not aware of any authority that supports that where the school district is on notice that a student may be on the autism spectrum, observes the student, and determines that he did not exhibit any characteristics of autism, that the district is still required to complete additional testing."

That conclusion, however, is directly contrary to the provisions of the IDEA and our precedent, which establish that if a school district is on notice that a child may have a particular disorder, it *must* assess that child for that disorder, regardless of the subjective views of its staff members concerning the likely outcome of such an assessment. That notice may come in the form of expressed parental concerns about a child's symptoms, as in *Pasatiempo*, of expressed opinions by informed professionals, as in *Hellgate*, or even by other less formal indicators, such as the child's behavior in or out of the classroom. A school district cannot disregard a non-frivolous suspicion of which it becomes aware simply because of the subjective views of its staff, nor can it dispel this suspicion through informal observation. Rather, such notice automatically triggers mandatory statutory procedures: the school district *must* conduct an assessment for all areas of the suspected disability using the comprehensive and reliable methods that the IDEA requires. In this case, it is particularly egregious that in conducting Luke's initial evaluation which assessed him for other possible disorders, Paso Robles deliberately refused to include an assessment of the one suspected disability of which it had clear notice—autism.

Peck, of course, did not conduct an assessment for autism, let alone one that complied with the IDEA. Not only was his involvement in Luke's initial evaluation not included within the original notice provided to Luke's parents, but he did not use a variety of standard or reliable methods. 20 U.S.C. § 1414(b)(3)(A). Rather, he used only one, generally unreliable method—informal observation—or to use a phrase later employed by him, observation "off the top of my head." While the record reflects that a complex form of structured observation may be used as a tool to identify autistic-like behavior, Peck was not certified at that time to perform that kind of testing, and in fact did not do so or even purport to have attempted to do so.

To hold that Peck's informal observation could overcome Paso Robles' statutory obligation to formally assess Luke for a suspected disability would allow school districts to disregard expressed and informed concerns about a child's disabilities on the basis of prejudicial stereotypes about what certain disabilities look like, rather than on the objective evidence and the thorough and reliable standardized testing that the IDEA requires. This result would be particularly devastating for children with autism because, as Dr. Freeman explained at the administrative hearing, the condition "can be very subtle" and manifest itself in many different ways. It would likely be missed by an informal observation, resulting in many children remaining undiagnosed, untreated, and unable to reach their full educational potential. The effect, moreover, would be felt most heavily by children from disadvantaged families without the sophistication or resources to obtain outside professional opinions.

B. *The Griffin Report Cannot Qualify as an Assessment that Satisfies Paso Robles' Obligations Under the IDEA*

Although Paso Robles does not advance the argument on appeal, the ALJ equivocally expressed an alternate theory as to why Paso Robles did not need to assess Luke for autism. Without citing any legal or factual support, the ALJ said that "[t]he District knew that [Luke] was to be formally assessed by a psychologist through Tri-Counties," and the Griffin Report "was so thorough, the District saw no need to conduct further assessments of [Luke]." There is no support in the record for this finding. The Griffin Report was conducted explicitly for the purpose of assisting Tri-Counties in determining whether Luke qualified for continued regional center services, *not* to gather information about him that could be used to determine his individual educational needs or to determine whether he qualified for special education under the IDEA. Further, Paso Robles took absolutely no steps to ensure that this assessment would occur or that it would be conducted and considered in a manner that complies with the IDEA. It also did not inform Luke's parents that it intended to rely, or did in fact rely, on the Griffin Report in creating Luke's IEP. Accordingly, the Griffin Report cannot qualify as an assessment that satisfies Paso Robles' obligations under the IDEA.[19]

---

[19] Amicus Curiae Learning Rights Law Center asks that we hold that school districts are *never* allowed to rely on the assessments performed by regional centers as a substitute for conducting their own. According to the amicus, the regional center's assessment is performed strictly for the purpose of diagnosing a child to determine eligibility to receive continued regional center services, whereas, in contrast, school districts must perform assessments *not only* to diagnose children's medical disability, but also to assess the child's strengths and needs for educational planning,

As an initial matter, there is no support for the ALJ's suggestion that Paso Robles did not assess Luke for autism because it "knew" that he was going to be assessed by Tri-Counties *or* for the finding that Paso Robles believed the Griffin Report to be comprehensive and thorough. To the contrary, the record clearly establishes that the reason Paso Robles did not assess Luke for autism was because it did not subjectively believe that he was autistic and because Peck had not observed any autistic-like behavior during his informal observation of Luke. Had Paso Robles truly intended to rely on Tri-Counties' assessment of Luke, it surely would have taken steps to ensure that the assessment occurred when, on November 10, 2009, it learned that Tri-Counties had not yet received parental consent to conduct an assessment. Instead, Paso Robles sent invitations to Luke's December IEP meeting that same day, signaling its intent to proceed without any assessment for autism by Tri-Counties or otherwise. Testimony from the administrative hearing, moreover, reveals that Paso Robles' staff believed the Griffin Report to be unreliable and inaccurate and that the District therefore disregarded it entirely. Peck criticized Dr. Griffin's methodology, and explained that he understood the "provisional" diagnosis to mean the results of the test were non-conclusive. Similarly, Stinson testified that she believed that Paso Robles could ignore the provisional diagnosis because the school district received a lot of reports of PDD-NOS when the child had only a severe language impairment.

Moreover, even were we to accept the ALJ's clearly erroneous factual findings, we would still be compelled to conclude that Paso Robles violated the IDEA because it took

including helping in the creation of an IEP. We express no view on this question.

absolutely no steps to "ensure" that the Tri-Counties assessment occurred or was conducted and considered in a manner that complies with the Act. *See Hellgate*, 541 F.3d at 1209 (holding that a school district may not "abdicate" its responsibilities under the IDEA and that merely referring a child's parents to a third party for testing violates the statutory requirement that the school district "ensure" that the child is assessed). Paso Robles did not explain to Luke's parents that it intended to rely on Tri-Counties to assess Luke for autism or include an assessment for autism in Luke's initial evaluation plan. *See* 20 U.S.C. § 1414(b)(1) & (c)(1). It also did not take any steps to ensure that the Tri-Counties assessment actually took place, nor did it give Luke's parents notice that the Griffin Report would be considered in creating Luke's IEP, as it would be required to do if it were part of Paso Robles' initial evaluation. *See* 20 U.S.C. § 1414(d)(3)(A)(iii) (requiring that the IEP Team consider "the results of the initial evaluation"); 34 C.F.R. § 300.503 (prior notice requirement). Finally, as described below in Part II, the report was never discussed or considered by Luke's IEP Team when creating his initial IEP.

In short, the record clearly reflects that Paso Robles was on notice that Luke might have a disorder on the autism spectrum before it developed and provided him with special educational services. It was therefore required by the IDEA to ensure that an assessment for that disability was conducted using the sound and reliable methods that the Act demands and to consider the results of that assessment when creating Luke's IEP and providing him special education services. It failed to do so, which in itself constituted a substantial procedural violation of the IDEA.

## II. Paso Robles' Violation of the IDEA's Procedural Requirements Denied Luke a Free Appropriate Education

Having concluded that Paso Robles violated the procedural requirements of the IDEA, we must determine whether the violations are "sufficient to support a finding that [Luke] was denied a [free appropriate public education]." *Amanda J.*, 267 F.3d at 892. While some procedural violations of the IDEA may be harmless, such errors constitute a denial of a free appropriate public education if they seriously impair the parents' opportunity to participate in the IEP formulation process, result in the loss of educational opportunity for the child, or cause a deprivation of the child's educational benefits. *Id.*; *see also M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 652 (9th Cir. 2005) (Gould, J., concurring). A loss of an educational opportunity occurs, for example, when there is a "strong likelihood" that, but for the procedural error, an alternative placement "would have been better considered." *Doug C.*, 720 F.3d at 1047 (quoting *M.L.*, 394 F.3d at 657 (Gould, J., concurring)). As we have previously held, to succeed on a claim that a child was denied a free appropriate public education because of a procedural error, the individual need not definitively show that his educational placement would have been different without the error. *Id.*

On more than one occasion, we have held that the provision of a free appropriate public education is "impossible" when the IEP Team fails to obtain information that might show that the child is autistic. *See, e.g.*, *Hellgate*, 541 F.3d at 1210 ("The failure to obtain critical medical information about whether a child has autism 'render[s] the accomplishment of the IDEA's goals—and the achievement

of a free appropriate public education—impossible.'"); *Amanda J.*, 267 F.3d at 894 ("The IEP team could not create an IEP that addressed Amanda's special needs as an autistic child without knowing that Amanda was autistic.").[20]

We reaffirm that holding today. As in *Hellgate* and *Amanda J.*, any goals set forth in Luke's IEP were likely inappropriate because they were made without sufficient evaluative information about Luke's individual capabilities as an autistic child. Indeed, testimony from Paso Robles' staff indicates that any ostensible progress that Luke made was likely attributable to an "underestimation of his abilities" at the outset.[21] Further, this lack of information denied Luke

---

[20] *Weissburg v. Lancaster School District*, 591 F.3d 1255 (9th Cir. 2010), cited by the amicus in support of the school district, does not undermine these cases. There, we noted that the IDEA does not give a student the legal right to a proper disability classification. Whether Luke should have been given a different eligibility classification, however, is not the basis of the plaintiffs' appeal. Instead, the question is whether the IEP Team could have properly created an individualized education plan tailored to Luke's particular needs without having before it the statutorily required assessment of him for autism.

[21] Although not essential to our holding that Luke was denied a FAPE, some evidence in the record suggests that Luke did not actually make meaningful progress toward even the limited goals in his IEP. There were conversations between Luke's parents and teachers during the 2009–2010 school year to the effect that Luke was not making adequate progress toward his goals and required a more intensive program. Further, Luke's assessment score dropped significantly between November 2009—when he was assessed by Dr. Griffin before he received any special education from Paso Robles—and January 2012—when he was assessed by Dr. Freeman. As Dr. Freeman explained, if Luke had made "meaningful progress," the score would have remained the same or increased. A significant drop suggested that Luke was "not keeping pace."

educational opportunities and substantially hindered his parents' ability to participate in the IEP process.

Here, there is strong reason to believe that alternative services would have at least been more seriously considered during the collaborative IEP process if the school district had formally assessed Luke for autism. *See Doug C.*, 720 F.3d at 1047. Because Luke was never formally so assessed, several members of Paso Robles' staff treated him as if he had selective mutism, an anxiety disorder. Rather than engaging in positive interventions to encourage Luke to talk, the staff strove to create an environment that would minimize his supposed anxiety. As Luke's private behaviorist explained, these actions should not have been taken in the case of an autistic child and may actually have reinforced Luke's refusal to speak. Similarly, as Erika Castro, a Paso Robles speech therapist, testified, had she been aware that Luke had been diagnosed by Dr. Griffin as having a disorder on the autism spectrum, she would not have suggested that he was selectively mute. Indeed, because she was under the misperception that Luke's refusal to speak was due to an anxiety disorder, she never suggested to Luke's teacher that he needed to be seen and possibly be treated by a behaviorist—a recommendation that she might have otherwise made. Such a referral would likely have been of immense benefit with respect to Luke's education, as evidenced by the tremendous improvement in his speech once he began receiving such services.

Further, by failing to assess Luke for autism, Paso Robles deprived Luke's parents of vital information necessary for them to meaningfully participate in the IEP process. It is clear from the record that Paso Robles considered assessing Luke for autism but decided not to do so after Peck's

informal and procedurally inadequate observation. It did not, however, explain this to Luke's parents. Without this information, his parents—who were not represented by counsel at the time—had no reason to question the initial evaluation report and had no basis to request an independent educational evaluation.

Paso Robles argues that it provided Luke with a free appropriate public education because its staff would have made the same recommendations as to the specialized services Luke required regardless whether he had been diagnosed as autistic. Peck, for example, testified that he would have made the same recommendations during the December 2009 IEP.[22] This argument is plainly contradicted by the fact that Paso Robles' staff treated Luke as if he were selectively mute, which they certainly would not have done if they had an assessment for autism. Even if true, however, this argument misses a central concern of our inquiry. The creation of an IEP is not a unilateral enterprise by the school district, but rather, a collaborative process that necessitates parents' input. Regardless whether Paso Robles staff might have made identical recommendations in the absence of informed parental participation in the collaborative process, the failure to obtain necessary information about Luke's disorder prevented an informed discussion with his parents

---

[22] Regardless of the veracity of this statement, the record strongly suggests that Peck would at least have made different recommendations at the December *2010* IEP. As he admitted during the administrative hearing, he did not suggest that Luke had autism or needed treatment for autistic behavior during that meeting because he had not yet "done an assessment" for autism. We need not further comment on how his testimony that he would not do so "off the top of [his] head" comports with the role he played in 2009 when he ruled out the need for an autism assessment on the basis of a casual observation.

about his specific needs as an autistic child.  Thus, Paso Robles' violation of the statutory requirement deprived Luke of educational opportunities *and* substantially hindered his parents' participation in the process.  So that there may be no similar misunderstanding in the future, we will say it once again:  the failure to obtain critical and statutorily mandated medical information about an autistic child and about his particular educational needs "'render[s] the accomplishment of the IDEA's goals—and the achievement of a FAPE—*impossible*.'"  *Hellgate*, 541 F.3d at 1210 (emphasis added) (quoting *Amanda J.*, 267 F.3d at 894).  Because the school district failed to conduct the statutorily mandated assessment of "all areas of suspected disability" it necessarily deprived Luke of a free appropriate public education.

Finally, in so holding, we reject the argument of the ALJ and the district court that any failure by Paso Robles to assess Luke for autism was harmless because Paso Robles relied heavily on the Griffin Report when creating Luke's IEP. There are three substantial problems with this argument: (1) there is no evidence that Paso Robles took any steps to ensure that the Griffin Report was conducted in a manner that complied with the IDEA's procedural requirements, (2) the determination that Paso Robles relied on the Griffin Report is entirely unsupported by, indeed is contrary to, the evidence in the record, and (3) any reliance on the Griffin Report was without notice to or discussion with Luke's parents, which would have substantially hindered their ability to fully and fairly participate in the IEP process, thus exacerbating the denial to Luke of a free appropriate public education.

First, as discussed *supra* Section I.B, Paso Robles took absolutely no steps to "ensure" that the Tri-Counties assessment occurred or that it was conducted in a manner that

complies with the procedural requirements of the Act. *See Hellgate*, 541 F.3d at 1209. Second, there is absolutely no evidence that the Griffin Report was actually discussed at Luke's December 2009 IEP meeting or that it was relied on at any point during the development of the IEP. The only evidence that it was considered at all is a single statement made by Peck at the administrative hearing that *he* considered it during the initial IEP meeting. When asked "So did you consider that assessment at the 12/4/2009 IEP meeting?" he responded "Yes." The fact that Peck "considered" the Griffin Assessment, however, does not suggest that it was relied upon when creating Luke's IEP or that it was carefully considered by the entire IEP Team. Rather, the argument is directly contrary to the unrefuted evidence that Paso Robles considered the report to be unreliable: Peck read the report, believed the "provisional" diagnosis meant that the results were non-conclusive, disregarded it, and did not even mention it during the IEP meeting. Similarly, none of Paso Robles' other staff members mentioned the Griffin Report when describing what the IEP Team discussed at the IEP meeting, and indeed, Luke's mother testified that she did not even know that the school district had received a copy of the report because it was never mentioned. The IEP, of course, makes absolutely no mention of the report. Finally, Paso Robles has maintained throughout these proceedings that the Griffin Reportmobook was of so little significance as not even to warrant a suspicion of autism.

Third, even if we were to accept the clearly erroneous factual finding that the report was "considered," that consideration would have constituted a further procedural violation that would only have exacerbated the denial of a free appropriate public education to Luke. That is because any purported reliance on the Griffin Report would have

occurred without notice to Luke's parents that the assessment was being considered in creating the IEP, as required by 34 C.F.R. § 300.503(a) & (b). The notice requirement provides parents with information necessary to an understanding of the rationale behind the school district's proposal, thus ensuring the "meaningful participation by parents and informed parental consent" that the IDEA was designed to afford. *M.M.*, 767 F.3d at 851. If Paso Robles had given Luke's parents written notice that the Griffin Report would be considered in drafting the IEP, it would have been required to explain to them why it disagreed with Dr. Griffin's diagnosis and to state whether it was making any recommendations for Luke's education based on her report. In the absence of such notice, however, Luke's parents were left without critical information. Because they did not have Paso Robles' relative sophistication, they could not be expected to understand how Tri-Counties' test results could affect Luke's special education eligibility or what services needed to be provided in light of Dr. Griffin's diagnosis. Accordingly, they could not give informed consent or participate meaningfully in the creation of the IEP, a separate statutory violation in itself.

Because we hold that the failure to assess Luke for autism constituted a substantial procedural violation of the IDEA that denied him a free appropriate public education during the 2009–2010 and 2010–2011 school years, we need not address the separate question raised by him on this appeal: whether the school district's failure to take appropriate steps to address his refusal to speak denied him a free appropriate education during those same years.

## CONCLUSION

Well before creating an individual education plan for Luke, Paso Robles had notice that he might have a disorder on the autism spectrum. Under the IDEA, the school district had an affirmative obligation to formally assess Luke for autism using reliable, standardized, and statutorily proscribed methods. Paso Robles, however, ignored the clear evidence requiring it to do so, and instead determined that Luke was not autistic based on the view of a staff member who opined, after a casual observation, that Luke did not display signs of autism. This failure to formally assess Luke's disability rendered the provision of a free appropriate education impossible and left his autism untreated for years while Paso Robles's staff, because of a lack of adequate information, took actions that may have been counter-productive and reinforced Luke's refusal to speak. We hold, therefore, that Paso Robles violated the IDEA and denied Luke a free appropriate public education during the 2009–2010 and 2010–2011 school years. We reverse the decision of the district court and remand for a determination of the appropriate remedy.

**REVERSED AND REMANDED.**